Indiana State Board of Finance v. State, ex rel.—188 Ind. 36.

THE INDIANA STATE BOARD OF FINANCE ET AL. v.
STATE OF INDIANA, EX REL. TRUSTEES OF
PURDUE UNIVERSITY.

[No. 22,994.    Filed January 31, 1919.]

1. COLLEGES AND UNIVERSITIES.—Appropriations.—Purdue.—Agricultural Extension. — The act of 1911 (Acts 1911 p. 80), appropriating $30,000 to Purdue University for agricultural work, like the similar acts of 1889, 1901 and 1907 that it repealed, was not passed for the maintenance of the university proper, but only constituted its officials as part of the body having charge of the expenditure of said sum in the interest of agricultural experiment work, etc.—a purpose independent as to funds and as to the extent of the work; hence, such appropriation was not terminated by the Mill Tax Act (Acts 1913 p. 505), which limited appropriations to the university to a specified amount.    pp. 40, 42 43.

2. COLLEGES AND UNIVERSITIES. — Appropriations. — Statute. — Construction.—Though the Mill Tax Act (Acts 1913 p. 505), which limited appropriations to Purdue University, provided a larger increase for the university than the officials asked for, the act did not terminate the appropriation for agricultural extension work provided in the act of 1911 (Acts 1911 p. 80), otherwise there would be no amount fixed for such work and the bureau, continued by law in charge thereof, would have no fund except at the discretion of the university trustees, who, under the law, constitute only a part of the governing body of the extension department, and their powers were not increased by the tax act.    p. 43.

3. COLLEGES AND UNIVERSITIES.—Appropriations.—Agricultural Experiment Station.—The Mill Tax Act (Acts 1913 p. 505), limiting appropriations to Purdue University, does not prevent the payment to the university of the appropriation of $75,000 for the Agricultural Experiment Station provided in Acts 1909 p. 403, since the act makes the university only a trustee for the experiment station, which was originally provided for by act of Congress of March 2, 1881 (§8878 et seq. U. S. Comp. St. 1916), appropriating funds to the state for such purpose. pp. 44, 46.

4. COLLEGES AND UNIVERSITIES. — Appropriations. — Statute. — Construction.—In limiting appropriations to Purdue University by the Mill Tax Act (Acts 1913 p. 505), the legislature did not intend to exclude appropriations made in earlier acts to the

Indiana State Board of Finance *v.* State, ex rel.—188 Ind. 36.

departments of agricultural extension and experiment work, since the legislature, at the same session, created other such departments, and made appropriations therefor to operate in the future, notwithstanding the limitations in the tax act. p. 46.

5. COLLEGES AND UNIVERSITIES.—*Appropriations.*—The Mill Tax Act (Acts 1913 p. 505), limiting appropriations to Purdue, does not affect the appropriations to the Agricultural Experiment Station provided in the Hog Cholera Act (Acts 1913 p. 333) and in the act relative to inspection of creameries (Acts 1913 p. 920, §6866a Burns 1914), this construction being manifest from the fact that the latter became effective on its passage—five days after the approval of the Mill Tax Act— and neither was payable to the university proper. pp. 47, 49.

6. COLLEGES AND UNIVERSITIES. — *Appropriations.* — *Statute.* — *Construction.*—The mention in the Mill Tax Act of 1913 (Acts 1913 p. 505) of the departments of Indiana University and the omission to mention the different departments of Purdue University indicate that the agricultural extension and experiment station departments of the latter were excluded from the use and benefit of the mill tax. p. 49.

7. COLLEGES AND UNIVERSITIES. — *Appropriations.* — *Statute.* — *Construction.*—That §4 of the Mill Tax Act (Acts 1913 p. 505), limiting appropriations to Purdue University, was to cut off appropriations for buildings and other special purposes, but not the previously established appropriations for the departments of agricultural extension and experiment work, is indicated by the fact that the legislature granted the university an appropriation greatly in excess of the amount demanded and provided that any surplus should not revert to the state but should be used for new buildings, a request for specific appropriations for new buildings having been denied. p. 50.

8. COLLEGES AND UNIVERSITIES. — *Appropriations.* — *Statute.* — *Construction.*—The federal appropriations for the agricultural experiment and extension departments of Purdue University may be terminated by the act of the state, and this fact warrants a construction of the saving clause in §4 of the Mill Tax Act (Acts 1913 p. 505) as applying to such appropriations, but not necessarily to the state appropriations. pp. 51, 53.

9. COLLEGES AND UNIVERSITIES. — *Appropriations.* — *Statute.* — *Construction.*—The appropriations for the departments of agricultural extension and experiment work in pursuance of federal acts are sufficiently permanent to be within §4 of the saving clause of the Mill Tax Act (Acts 1913 p. 505), and are therefore exempt from the provisions of the act limiting appropriations to the university. p. 53.

Indiana State Board of Finance *v.* State, ex rel.—188 Ind. 36.

10. COLLEGES AND UNIVERSITIES. — *Appropriations.* — *Statute.*— *Construction.*—The Mill Tax Act (Acts 1913 p. 505), limiting appropriations to Purdue University, did not repeal the act of 1913 appropriating to the university $30,000 for greenhouse, $28,000 for a new dairy building, and $125,000 for the purchase of additional farm land for the agricultural department, since such sums under the tax act would not have become available until the year following, and there was immediate need therefor. · p. 53.

From Marion Superior Court (99,089) ; *W. W. Thornton,* Judge.

Action by the State of Indiana, on relation of the trustees of Purdue University, against the Indiana State Board of Finance, the Governor ·and others. From a judgment for the plaintiff, the defendants appeal. *Affirmed.*

*Evan B. Stotsenburg,* Attorney-General, and *Wilbur T. Grueber,* for appellants.

*Allison E. Stuart, David E. Fulwider* and *Dan W. Sims,* for appellees.

HARVEY, J.—The general assembly of 1913 (Acts 1913, ch. 182, p. 505) provided a mill tax for the use and benefit of its educational institutions, Indiana University, Purdue University and the State Normal. This act increased the mill tax from two and three-quarters to seven cents. The act apportioned this tax two-fifths to Indiana University, two-fifths to Purdue University and one-fifth to the State Normal School.

This act contains the following: "When the funds provided for by this act for said educational institutions shall become available, said funds shall constitute the total amounts to be paid out of the treasury of the state to said institutions·for any purpose, thereafter, and all acts and parts of acts in conflict with this provision are hereby repealed."

And the following proviso: "Provided, That nothing

in this act shall affect in any way any endowment or permanent fund .or funds that may belong to or may have been appropriated for either Indiana University or Purdue University or the right of any of said institutions mentioned in this act to any taxes heretofore levied for their benefit, but all such taxes heretofore levied are hereby saved to said institutions."   §4.

Because of the quoted provisions, the state's then board of finance and the trustees of Purdue University disagreed as to whether an annual continuing appropriation of $30,000 for what is known as the "Agricultural Extension Bureau" of the university, and also an appropriation of $75,000 per annum for what is known as the "Agricultural Experiment Station" should be continued.

The state officers and said trustees also failed to agree as to whether certain other appropriations made at the 1913 session should be withheld from Purdue University because of said quoted provision.

The language above quoted which, it is claimed, prevents payment to the university of any fund other than the tax, and the language quoted which saves to the university certain funds, cannot be fully understood without reading in connection therewith the history of the financial provisions for maintenance of the university in its general and ordinary features; and for the maintenance of several special bureaus, stations and departments, which, though closely associated with the university, are not in a legal sense component parts thereof or administered thereby.

Failure to observe the distinction just suggested has resulted in confusion in some of the statutes to such an extent that the same cannot be reconciled when the exact language used is alone considered; whereas, when the character and purpose of the various special objects to be attained, and the means provided for administra-

tion to secure such objects are considered, much of such confusion disappears, and a reasonable result is reached, though the same may seem to conflict with some of the language found in the statute.

Having given careful consideration to such history, as disclosed by all the statutes relating to said matters, the court finds that the university proper has

1. been maintained to a large extent by appropriations or taxes for general and current expenses and for general maintenance, while another and distinct line of appropriations has been made, not for such maintenance, but, by express limitations, separated from such maintenance and confined to special purposes and departments. The court finds that while several of the latter class of appropriations were made to the university, or made payable to its treasurer, yet the expenditure thereof was not committed to the trustees thereof, as were all the general maintenance appropriations or taxes, but such expenditures were committed to special boards, committees, or other like bodies created by statute for the purpose.

Of the latter character is the $30,000 appropriation herein contested. This is designed for the support alone of the Agricultural Extension Department. This department is the outgrowth of the creation by statute in 1889 (Acts 1889 p. 273, §3210 *et seq.* Burns 1914) of county institutes, for the instruction in the several counties of farmers and others in agriculture and kindred subjects. Instructors for the respective counties were to be selected by the committee of experimental agriculture and horticulture of the board of trustees, together with the faculty of the school of agriculture of Purdue University.

An original appropriation of $5,000 was made for the purpose of paying the salaries of instructors and other necessary expenses, the same to be expended under the

Indiana State Board of Finance *v.* State, ex rel.—188 Ind. 36.

direction of said committee of said board of trustees, "and they shall annually report such expenditures and the purposes thereof to the Governor." It will be noticed that the board of trustees of the university had nothing to do with this appropriation, only that part of the board constituting said committee. The committee and said faculty were not required to report to the board of the university. This appropriation was increased to $10,000 in 1901 (Acts 1901 p. 92).

In 1907 (Acts 1907 p. 183, §3213 Burns 1914), to increase the moneys to be expended for the extension of farmers' institute work, it was provided by statute that the chairmen of such institutes should, under regulations adopted by the superintendent of county institutes, be entitled to draw from the treasury the sum of not exceeding $100 once each year, and as justifying such expense such chairman shall file with the county auditor a list of members paying a membership fee of at least twenty-five cents and a statement of expenses, such expenses to include prizes for extraordinary excellence in agricultural and domestic sciences.

Payment of this appropriation for extension work was continued, notwithstanding the Mill Tax Act of 1895 (Acts 1895 p. 171, §6166a Burns 1901) prohibited any other payment to the university for maintenance than the tax created by the act of 1895. To meet an argument of appellants that this was a departmental construction favoring the idea that these special funds are not so prohibited, the state officers admit that the appropriation to the extension department was "in no sense an appropriation to Purdue University," and further say "said fund was not for the use of the university at all. It was only constituted the agent of the state in the expenditure of the fund in the encouragement of agriculture."

The above named acts of 1899, 1901 and 1907 were

repealed in 1911 (Acts 1911 p. 80). Though this was an entirely new act, it provided for similar extension work in the various counties. It provided that local expenses not exceeding twenty-five cents for each square mile of territory in the county should be paid by the county, and directed the county councils tò make appropriations therefor.

By this act of 1911 an appropriation of $10,000 for the current year, and $30,000 annually thereafter, was made to Purdue University, the act providing that said sum shall be expended by the school of agriculture and the agricultural experiment station of the university in securing the necessary office force, extension workers, lecturers and equipment, and other expenses of holding such institutes, contests, and any other such work agreed upon by the authorities of Purdue University, the work to be carried out by said Purdue University through the extension department of the school of agriculture and agricultural experiment station, under such rules and regulations as may be prescribed, and along the lines determined by the board of trustees, president of the university, the dean of the school of agriculture, the director of the Agricultural Experiment Station, the superintendent of agricultural extension, and the advisory committee named in the act of 1909, which committee was composed of one person appointed by each the State Corn Growers' Association, State Dairymen's Association, State Live Stock Association, State Horticultural Society, and the State Poultry Fanciers' Association.

This appropriation of $30,000 in controversy cannot, in view of the foregoing provisions, be found to be to the university for university purposes. Its expenditure is not committed to the judgment and discretion of the trustees alone, though they are

by this act made part of the body to the judgment and discretion of which such expenditure is committed.

The workers, lecturers, and so forth, to whom it is paid out are not employes of the university. The county funds appropriated for local expenses do not concern the accounts of Purdue University, and yet they are in aid of the work to be done by the extension bureau. The facts impelling the appellants, state officers, to admit that the earlier appropriations for the use of the extension department were not made to the university apply equally to said funds under the new act of 1911, *supra.*

The theory of the appellant state officers is that the increase in the mill tax of 1913 was made so much larger than was asked by the university as to

2. clearly indicate, in connection with the prohibition above quoted, that the mill tax was to be used by the university to continue this extension work. If the provision of *funds* in the extension work statute is repealed, then no amount remains *fixed* therefor; and if appellants' theory is correct, it is left to the board of trustees of the university to parcel out the mill tax proceeds, and to fix the amount for the extension bureau and other such departments.

The law continuing this bureau continues the organization therefor prescribed by statute, including the body that is to fix salaries of instructors, and so forth; but if appellants are correct, that body has no fund except at the discretion of the trustees of the university, who, by the act, constitute only a portion of the governing body of the bureau and the tax act does not increase the power of the trustees in this respect.

If this theory is adopted, we find a complete abandonment by the state of a long-continued purpose that this bureau shall be *independent* as to *funds,* and as

1. to the *extent of its work,* and for that purpose

the expenditure of its funds shall be subject to the judgment of others than said trustees. In our opinion the trustees, or the treasurer of the university, are only designated as agents for the specific purpose of holding such special funds, and are not acting in their general capacity as officials of the university. A prohibition of payment to the university of other than the tax, for any purpose, does not prevent a payment to the trustees as such special agents.

A similar situation exists as to the agricultural experiment station, for which special appropriations have been made by the state since in 1887, the federal government, by act of Congress (Act March 2, 1887, 24 St. at L. 440 [§8878 *et seq.* U. S. Comp. St. 1916]) declared that an agricultural experiment station "shall be established under the direction of the college, or colleges or agricultural department of colleges" in each state, created in compliance with an earlier grant of land scrip made by Congress. The Congress appropriated to the state the sum of $15,000, to be paid annually, "to the treasurer, or other officer, appointed by the governing boards of such colleges to receive the same" for experimental work, and for the printing and distribution of the results thereof. Congress provided that such appropriation shall be equally divided between any two such colleges then, or thereafter, established in any state. The act of Congress directed specifically, and also generally, the character of experiments to be made, and that the *station* shall co-operate with the Secretary of Agriculture in establishing and operating subsidiary stations for certain purposes. It is made the duty of the Secretary of Agriculture to furnish forms for the tabulation of results of experiments, and to indicate from time to time such lines of inquiry as "to him shall seem most important." That it shall be the duty of each such sta-

NOVEMBER TERM, 1918.    45

Indiana State Board of Finance v. State, ex rel.—188 Ind. 36.

tion to report annually to the Governor of the state (not to the college) a full and detailed statement of its operations, and of its receipts and expenditures, a copy of which shall be sent to each of such stations and to the Commissioner of Agriculture, and to the Secretary of State of the United States; this financial statement to be on a form prescribed by the Secretary of Agriculture. Bulletins are required to be sent each three months to each newspaper in the state, and to individuals requesting the same, these to be transmitted by mail free of postage charge. Congress provided that the *state legislature* may apply said appropriation, in whole or in part, to such stations established in connection with *any* college or university, or institution, not distinctly an agricultural college or school, or to such *stations* established *separate* from such colleges, or established in connection with an agricultural college; and the congressional act expressly provides that "no legislature shall by contract, express or implied, disable itself from so doing." The act reserves the right to annul, suspend or repeal any or all said provisions. The state accepted said terms and appropriation for and on behalf of Purdue University, and such a station was established.

In 1906 the Congress (Acts March 16, 1906, 34 St. at L. 63 [§8891 *et seq*. U. S. Comp. St. 1916]) made an appropriation "to each state," for the more complete endowment of agricultural experiment stations, a sum to be increased annually until the amount of $30,-000 was reached, and $30,000 annually thereafter, to be paid to the officer designated by the "governing *Boards of such experimental stations*," (note this right of designation is by this act withdrawn from the governing board of such colleges) and the officer so designated to receive said appropriation shall annually report to the Secretary of Agriculture a detailed state-

46 SUPREME COURT OF INDIANA,

Indiana State Board of Finance v. State, ex rel.—188 Ind. 36.

ment of disbursements, and also to the Governor of the state for transmission to the Secretary of Agriculture and the Treasurer of the United States.

The state made various appropriations to Purdue University for this experiment station, and for buildings therefor; and in 1905 (Acts 1905 p. 142) made an appropriation to Purdue University of $5,000 for the year 1905, and of $25,000 annually thereafter; and provided that said $5,000 should be expended by the director of the experiment station for general purposes named; and said $25,000 should be expended by the agricultural department of the university in designated sums for specific purposes; and further provided that the work outlined should be carried out by said department along lines agreed upon by said director and an advisory committee of three, one of whom shall be appointed by the corn growers' association, one by the dairymen's association, and one by the live stock association.

In 1909 (Acts 1909 p. 403, §6864 et seq. Burns 1914) the last-mentioned act was so amended as to appropriate $75,000 per annum to Purdue University "for 3. the exclusive use of the experiment station of the university." This act added to the advisory committee one person, to be appointed by the state horticultural association, and one by the state poultry fancier's association. The continuance of this appropriation is in question here. It is not an appropriation to the university as a university, but as a trustee for such station, and the tax act of 1913, supra, neither repeals this provision for the station, nor changes the organization of its management.

That neither the extension bureau nor the experiment station is deemed such parts of the university that the mill tax is intended therefor to the exclusion of 4. earlier appropriations is emphasized by the fact

that the state at the same session, 1913, at which it passed the Mill Tax Act in question created other such departments, or bureaus, and made certain annual appropriations therefor to operate in the future, notwithstanding the prohibition in the mill tax act of other funds to the university than the tax.

The act of March 7, 1913 (Acts 1913 pp. 333-338, §3273a *et seq.* Burns 1914), commonly known as the Hog Cholera Act, appropriates $15,000 "to be

5. paid to the director of the Purdue University Agricultural Experiment Station * * * the same to be paid into the treasury of said Purdue University, the board of control of which shall expend the same upon proper vouchers to be filed with the auditor of state." "The annual report of the director of the experiment station shall" show the receipts and disbursements of fees received under this act. It is to be remembered that this annual report is to the Governor for the federal officers.

This act appropriates $10,000 annually "to the Indiana State Veterinarian," who shall expend the same upon proper vouchers to be approved by the Governor, and filed with the auditor of state; the same to be used for expenses and assistants in carrying out the provisions of the *Hog Cholera Act.* This act was approved three days before the approval of the Mill Tax Act.

On March 15, 1913 (Acts 1913 pp. 920-927, §6866a *et seq.* Burns 1914), an appropriation was made of $1,000 annually to Purdue University for the exclusive use of Purdue University Agricultural Station, same to be paid to the treasurer of the university, and expended for the purpose of providing necessary equipment and paying the expenses of inspection of creameries, the examination and testing of glassware, the examination of candidates for license as testers, and the dissemination of information and instruction by means of publications

48    SUPREME COURT OF INDIANA,

Indiana State Board of Finance *v.* State, ex rel.—188 Ind. 36.

and otherwise; all testing and weighing apparatus to be inspected and stamped by the agricultural experiment station. Testers' licenses were to be issued and to be revoked by the experiment station upon the certificate of an examining board, this examining board to consist of two members appointed by the examination committee of the Indiana State Dairy Association, and the third member shall be chief of the dairy department of Purdue University Experiment Station. For such licenses a fee of $2 shall be paid to the Purdue University Experiment Station.

A license to operate a creamery is required to be issued by the Agricultural Experiment Station, upon payment to the station of a fee of $6. Creameries shall pay to the experiment station three cents for each piece of glassware examined. The sums so received shall be by the director of the experiment station paid to the treasurer of Purdue University, to be paid out by the board of control for expenses of carrying out the terms of the act, and other expenses of the experiment station. The director of the station shall include in his annual report to the Governor a statement of such receipts and expenditures.

This act was approved five days after the tax act was approved. This act makes the milk-testing department more a part of the experiment station than of Purdue University proper, and directs that operations thereunder be performed by the officers of the experiment station, and the examining board referred to, rather than by, the trustees of the university. The treasurer and the board of control of the university act only as holding trustees of funds to be paid out on obligations incurred by others. The reports of operations and expenditures go to the Governor, rather than to the trustees.

The tax act could not produce a revenue within one

year, and the declaration of the assembly was that this appropriation of $1,000, made five days after the tax act was approved, should be effective immediately, and there is no provision that this appropriation should cease when the tax produced a revenue. This act further shows that the revenues of these departments are not in the maintenance funds of the university. All things considered, we conclude that this appropriation was not to the university. The repealing clause of the tax act, approved five days prior, did not affect this appropriation, and the saving proviso has no bearing upon the same.

The act creating the tax provides that the levy shall be made for the use and benefit of the "Indiana University, (Indiana University School of Medicine and Hospital) Purdue University and the Indiana State Normal School." It is significant that the assembly expressly mentioned, as provided for by the levy, the medical school and hospital of Indiana University, and did not mention, as provided for by the levy, any of the departments of Purdue University, though the same are in their organization and operations as distinct from Purdue as though geographically separate from Purdue University. The mention of the departments of one as covered by the tax at least argues that the failure to mention the departments of the other excludes the latter departments from the use and benefit of the tax.

It is argued that if these special appropriations are not cut off by the prohibition against payment to Purdue of other than the tax "for any purpose," then said prohibition in the act is useless and has no purpose, and that the court is not at liberty to disregard any word or phrase in the act if a reasonable use and meaning can be assigned thereto.

Here, again, we must consider the conditions existing at the passage of the act; and by so doing we find a reason for the prohibition in §4, though said

7. prohibition cuts off no annual appropriation. The university had repeatedly asked prior sessions of the assembly for appropriations for buildings and additional land, and many of said requests had been denied. At this session the university asked not only for twice the amount of tax it was then receiving but asked appropriations for additional land, and for at least eight additional buildings. The estimated amount of these needs was $395,000. The assembly declined to make such special appropriations, except as to three matters hereafter mentioned. The assembly granted an increase of tax almost double the increase asked, and prescribed that any surplus of such tax should not revert to the state, but should remain to the credit of the university for buildings and physical improvements. This was a radical departure from any provision for buildings theretofore made; all former funds for buildings had been specifically appropriated. Having thus provided an increased maintenance fund for the university and for buildings, the legislature stipulated that "when the funds provided for by this act .* * * shall become available, said funds shall constitute the total amounts to be paid out of the treasury of the state to said institution for any purpose," and repealed all conflicting laws. Of course, this declaration was not binding on future sessions, but it expresses the opinion of the session of 1913 that said tax must be sufficient for all needs of the university proper, and thus we find a reasonable meaning for the prohibitive words consistent with the continuation of the special departments under the management of others than the trustees of the university, and the continuation of fixed amounts for their

maintenance, and no disturbance of the separate identity or management of either such department.

It is also argued that, if these special appropriations are not affected by said prohibition, then there exists no occasion for the proviso which saves endowments and permanent funds appropriated to the university, because it is asserted the latter cannot be repealed.

We find ample reason for the saving of such so-called endowment and permanent funds, though the same may be in a sense properly denominated as endowment or permanent. The Indiana Agricultural College, now known as Purdue University, was established in accord with the terms of an act of Congress appropriating in 1862 land scrip to each loyal state (Act July 2, 1862, ch. 130, 12 St. at L. 503), to be sold and the proceeds to constitute a perpetual fund, the income "of which shall be inviolably *appropriated* by *each state* to the endowment, support and maintenance of at least one college where the leading object shall be," briefly stated, the study of agriculture and associated sciences. In 1865 Indiana accepted the conditions named, and directed that the trustees of said college should by their treasurer receive said scrip, and invest the proceeds thereof. The fund so derived produces the sum of $17,000 per year for the university. Purdue's right to such interest grew out of an *appropriation by the state.*

Decisions have been rendered in several of the states, and by the Supreme Court of the United States, that this fund is by Congress appropriated to the state, and no college is entitled thereto until appropriated to the college by the state. *State, ex rel.* v. *Irvine* (1905), 14 Wyo. 318, 84 Pac. 90, affirmed by Supreme Court of United States, 206 U. S. 278, 27 Sup. Ct. 613, 51 L. Ed. 1063. See, also, *Haire* v. *Rice* (1906), 204 U. S. 291, 27 Sup. Ct. 281, 51 L. Ed. 490; *Brown University* v.

52        SUPREME COURT OF INDIANA,

Indiana State Board of Finance *v.* State, ex rel.—188 Ind. 36.

*Rhode Island College* (1893), (C. C.) 56 Fed. 55; *Massachusetts Agrl. College* v. *Marden* (1892), 156 Mass. 150, 30 N. E. 555.

In 1890 (Act August 30, 1890, ch. 841, 26 St. at L. 417 [§§8871-8876 U. S. Comp. St. 1916]) Congress appropriated "to each state * * * for the more complete endowment of such colleges then or thereafter to be established a sum to be increased annually until amounting to $25,000, said sum to be paid to the state treasurer, or such other officer as the state may designate, who shall, upon the order of the trustees of such college, pay the sum over to the treasurer of such college.". This law provides that when a state has established an educational institution of like character for colored students, the state may make a "just and equitable division" of this fund between the college and such institution.

The Secretary of the Interior shall annually certify to the Secretary of the Treasury whether any state continues to be entitled to said appropriation, and Congress reserved the power to amend, suspend or repeal any or all the provisions of the act. In 1891 the state accepted said appropriation and designated Purdue University as the agricultural college entitled to said grant. In 1907 (Act March 4, 1907, 34 St. at L. 1281 [§8877 U. S. Comp. St. 1916]) the foregoing act was amended to increase said appropriation to $50,000, to be paid to the state annually, for the further endowment of such colleges.

It is the contention of the university that these federal appropriations belong to the university and are not subject to repeal by legislative act of the state, and that there was no occasion for saying the same by the proviso in said tax act; and that it follows that the proviso was intended to save the other continuing annual state appropriations.

It is the contention of the state that the federal appropriations are subject to repeal or division,- or loss, by some act of the state; and that, therefore, there was reason for saving the federal funds by said proviso, and hence the state appropriations are not referred to in the proviso, but are cut off by the prohibition of other funds than the tax.

It is the opinion of the court that said federal appropriations may be destroyed by some act of the state, and that there was occasion for a declaration preventing the tax act from affecting the same. It further results that the saving provision does not necessarily relate to the state appropriations.

If, however, we are wrong in holding that these state appropriations belong exclusively to the several departments and bureaus, then they belong to the university, and are cut off unless saved. In the sense that the state must continue, somehow and somewhere, such departments to continue its right to the federal appropriations, and in view of the fact that Purdue University is now and probably always will be the state's only agricultural college, it may be fairly said that said appropriations are sufficiently permanent appropriations to fit the definition of said saving clause, and said clause is broad enough to include them, or exempt them from said prohibition.

Four funds in question remain to be considered. Three of them are specific appropriations contained in a general appropriation act, approved March 11, 1913, the next day after the tax act was approved (Acts 1913 p. 515), to wit: "For Purdue University Green-house, $30,000; equipment for new dairy building, $28,000; for purchase of additional farm land for the agricultural department, the Governor is hereby authorized and directed to apply a sum not exceeding $125,000, if in the judgment of the Auditor of

54    SUPREME COURT OF INDIANA,

Indiana State Board of Finance *v.* State, ex rel.—188 Ind. 36.

State and Treasurer of State suitable lands can be procured."

The tax act was designed to produce a surplus which was to be the only fund for buildings and physical improvement. The first of this tax was not available, however, until 1914. The legislature evidently deemed said greenhouse and dairy equipment and additional land immediately needed, and, having power, notwithstanding the prohibition mentioned to so do, appropriated for these three needed purposes. The appropriation for additional land was not to the university, nor subject to order of its trustees, though for its benefit. Its use was committed to the judgment of the officers named. Payment of these funds was not prohibited, nor were these appropriations repealed. Only that part of each which is called for by contracts duly made for these several purposes can be paid out, and, hence, the order herein that they shall be paid to the university is to be construed as requiring payment only to the amount and in discharge of such contracts.

Finally, an appropriation was made on March 13, 1913 (Acts 1913 p. 572), for maintenance, in lieu of increasing the tax levy for 1913, of $32,500, providing that in event a change in the *educational* tax is made, this appropriation shall be available only until the new tax is available, when an adjustment between this appropriation and the new tax is to be made by the state auditor to avoid duplication. The trial court denied the right of the university to any further part of this appropriation after the decree. This part of the decree is not questioned here, and this appropriation is mentioned only to show that the assembly was mindful of the current, immediate needs of the university, and therefore intended that the other specific amounts for building and land should be paid.

We find no error in the conclusions of law excepted to, and affirm the judgment.

Note.—Reported in 121 N. E. 649. Appropriations, what are, note 22 Am. St. 638.