STATE EX REL. JONES, RELATOR, *v.* ERICKSON, GOVERNOR, ET AL., RESPONDENTS.

(No. 5,883.)

(Submitted January 18, 1926.   Decided February 20, 1926.)

[244 Pac. 287.]

*Injunction—Taxation for State Purposes—Increase in Rate by Statute—Constitutional Law—Initiative Measure—Title— Sufficiency—Constitutional Construction—Rules—University of Montana—Agricultural Experiment Stations—Extension Service—Not Parts of Agricultural College—Legislative Appropriations—State Board of Examiners—Powers.*

Taxation for State Purposes—Statute Increasing Rate—Initiative Measure —Not Amendment of Constitution.
1.  *Held,* on application for writ of injunction, that section 2148, Revised Codes, initiated by the people, increasing the rate of taxation for state purposes, is not invalid as an attempted submission of an amendment to section 9, Article XII of the Constitution, without having been first proposed by one of the houses of the legislative assembly as required by section 9 of Article XIX, since a change in the rate of taxation may be brought about by Act of the legislature or by a law initiated by the people without submission of a constitutional amendment in the mode prescribed by section 9, Article XIX.

Statutes—Initiative Measures of Equal Dignity With Legislative Acts.
2.  Statutes enacted by the people directly under the initiative are of equal dignity with those passed by the legislative assembly, the power to legislate in either manner being plenary.

Same—Constitutionality *Prima Facie* Presumed.
3.  As in the case of an Act passed by the legislature, so in case of one passed by the people, the constitutionality thereof is *prima facie* presumed and every intendment is in favor of upholding it unless it appears unconstitutional beyond a reasonable doubt.

Same—Constitutionality—Rule—Legislative Construction Entitled to Consideration.
4.  Where two constructions of an Act are possible, one of which will result in declaring it constitutional and the other unconstitutional, the courts will prefer the former, and legislative construction of its provisions, while not binding upon courts, is entitled to respectful consideration.

Same—Title—Constitutional Requirement of Unity of Subject Met—When.

5. Where two or more propositions are contained in the title of an Act which may be logically viewed as parts or aspects of a single plan, the constitutional requirement (Art. V, sec. 23) of unity of subject is met.

Same—Unity of Title—Constitution.

6. The unity of title to an Act required by the Constitution is served notwithstanding the existence of many provisions in the body of the Act, if such provisions are germane to the general subject expressed.

Statutory Construction—Duty of Courts—Rules of Grammar—Position of Comma—How Regarded.

7. In construing a statute the courts must elicit its purpose and intent from the terms employed therein, if possible, calling to their aid the ordinary rules of grammar; in doing so, however, great weight should not be given to the position of a comma.

Statutes—Unity of Title—Particle "and" Joining Co-ordinate Phrases—Construction.

8. The fact that in the title of an Act the particle "and" is used to join two co-ordinate phrases is not alone sufficient to indicate more than one purpose in view, since the chief thought in the sentence may be contained in the first phrase thereof, while the thought in the second phrase is subordinate thereto, and under such conditions it is permissible, in order to give emphasis to the chief thought, to change the phrase containing the subordinate thought to a participial phrase.

Taxation for State Purposes—Increase of Rate—Statute—Constitutionality.

9. *Held,* under the above rules of statutory construction, that the title to Initiative Measure No. 18 (Laws 1921, p. 700), now section 2148, Revised Codes of 1921, increasing the rate of taxation for state purposes, is not open to the objection that its title contains more than one subject contrary to the provisions of section 23, Article V of the Constitution.

Same — Statute Increasing Rate — Making Appropriations — Constitutionality.

10. Section 2148, Revised Codes, increasing the tax levy for state purposes by one and one-half mills for the period of ten years and directing successive legislatures for that period how the proceeds thereof shall be appropriated, and authorizing the assembly to make the appropriations for each of the ten years, *held,* not unconstitutional as appropriating money for ten years, or at all, in violation of section 12, Article XII, prohibiting the making of appropriations for more than two years. (The question whether direction to successive legislatures as to how money shall be appropriated is binding upon such bodies, reserved.)

---

5. Title of statute as embracing but one subject, see notes in 61 Am. Dec. 337; 79 Am. St. Rep. 456.

Construction of constitutional provisions relative to titles of statutes, see notes in 1 Ann. Cas. 584; Ann. Cas. 1915A, 79. See, also, 25 R. C. L. 843.

7. See 25 R. C. L. 965.

Same—University of Montana—Experiment Stations and Extension Service not Parts of Agricultural College—Not Entitled to Share in Increase of Rate of Taxation for State Purposes.

11. *Held*, that the agricultural experiment station and the agricultural extension service are not parts of the agricultural college or component parts of the University of Montana; hence appropriations made for them cannot be charged to receipts from the mill and a half levy for state purposes authorized by section 2148, Revised Codes of 1921, for the maintenance of the University.

Statutes—Title Need not Contain What.

12. It is not necessary that the title to an Act shall contain or embody the exact limitations or qualifications contained in the bill itself which are germane to its purposes, if the general subject of the measure is clearly expressed in the title; hence in the construction of the statute, it is the wording in the body of it and not that of the title which controls.

Taxation for State Purposes—University of Montana—Appropriations Held not to Exceed Receipts from Increased Rate of Taxation for Years 1925 and 1926.

13. Under the showing made on application for writ of injunction against the state board of examiners, *held* that the appropriations made by the legislature for the years 1925 and 1926 for the four teaching units comprising the University of Montana do not exceed the amount received from the one and one-half mill levy authorized by section 2148, Revised Codes, for their maintenance, and therefore do not transgress the provision of section 12, Article XII, prohibiting appropriations exceeding the total tax provided by law.

State Board of Examiners—Legislative Appropriations—Board Without Power Arbitrarily to Reduce.

14. When the state board of examiners has exercised the powers conferred upon it by the Constitution and state statutes, its functions are ended; and where the legislature has made an appropriation which in its judgment it deems necessary for the support and maintenance of a state institution for any fiscal year and in doing so has kept within constitutional restrictions, the board is without power arbitrarily to reduce the amount so appropriated, since such a course would constitute a usurpation of legislative function by the executive department of the state government.

---

[1] Constitutional Law, 12 C. J., sec. 18, p. 683, n. 86.

[2–9] Constitutional Law, 12 C. J., sec. 220, p. 788, n. 1; sec. 221, p. 794, n. 22 New; sec. 222, p. 794, n. 24; p. 797, n. 34. Statutes, 36 Cyc., p. 942, n. 21; p. 1026, n. 17; p. 1029, n. 25; p. 1102, n. 87 New; p. 1107, n. 30; p. 1110, n. 54; p. 1117, n. 15, 17; p. 1142, n. 80.

[10] States, 36 Cyc., p. 894, n. 30.

[11] Also 2 C. J., p. 1164, n. 47. Colleges and Universities, 11 C. J., sec. 1, p. 972, n. 2; p. 975, n. 10 New; sec. 18, p. 991, n. 31 New.

[12] Statutes, 36 Cyc., p. 1134, n. 95.

[13] Colleges and Universities, 11 C. J., sec. 11, p. 986, n. 43.

[14] States, 36 Cyc., p. 865, n. 99.

12. Sufficiency of title of statute, see note in 64 Am. St. Rep. 70. See, also, 25 R. C. L. 855.

[75 Mont. 429.]

Original application by the State, on the relation of Francis D. Jones, against J. E. Erickson, Governor, and others, as members of the State Board of Examiners, for writ of injunction, to restrain them from approving certain claims upon funds derived from the mill and one-half increase in taxation for state purpose authorized by section 2148, Revised Codes of 1921, to be used for the support and maintenance of the University of Montana. Writ issued.

*Messrs. Murphy & Whitlock* and *Mr. George Y. Patten,* for Plaintiff, submitted briefs; *Mr. A. N. Whitlock* and *Mr. Patten* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. A. H. Angstman* and *Mr. C. N. Davidson,* Assistant Attorneys General, for Defendants, submitted a brief; *Mr. Angstman* and *Mr. Davidson* argued the cause orally.

*Mr. Frank Woody, Amicus Curiae,* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Application of the state, on relation of Francis D. Jones, a taxpayer, to have this court, in the exercise of its original jurisdiction, declare that the proceeds of the state tax levy provided for in section 2148, Revised Codes of 1921, to the extent of one and one-half mills thereof, shall be used exclusively for the support, maintenance and improvement of the four teaching units of the University of Montana, and to perpetually enjoin and restrain the defendants, as members of the state board of examiners, from using any part of the same for any other purpose, and from paying certain claims, by the board approved and ordered paid, from the proceeds of such portion of the state levy for the fiscal year beginning July 1, 1925, and ending June 30, 1926.

From this application it appears: That, prior to the enactment of the above section, the state tax levy was fixed by

the provisions of section 9 of Article XII of the state Constitution, as follows: "The rate of taxation on real and personal property for state purposes, except as hereinafter provided, shall never exceed two and one-half mills on each dollar of valuation; and whenever the taxable property of the state shall amount to six hundred million dollars ($600,-000,000.00) the rate shall never exceed two (2) mills on each dollar of valuation, unless the proposition to increase such rate, specifying the rate proposed and the time during which the rate shall be levied shall have been submitted to the people at the general election and shall have received a majority of all votes cast for and against it at such election.   *   *   *   "

That in the year 1920 the value of the taxable property of the state had passed the $600,000,000 mark. That certain persons or groups of persons connected with and interested in higher education in the state conceived the idea of increasing the tax levy authorized to three and one-half mills, of which one and one-half mills should be devoted to the purposes named in a measure to be submitted. All necessary steps were taken for the initiation of such measure under the provisions of section 1 of Article V of the Constitution, and the measure was duly submitted to the people at the November general election in 1920. The measure received a majority of all votes cast for and against it in said election and became effective December 6, 1920. It now appears as section 2148, Revised Codes of 1921, above referred to, and reads as follows: "The rate of taxation on real and personal property for state purposes for each year for a period of ten years, beginning with the year 1921, shall be increased one and one-half mills on each dollar of valuation, and the legislative assembly is authorized and empowered to levy a tax for state purposes for each of said years of not exceeding three and one-half mills on each dollar of valuation for state purposes, and all money derived from one and one-half mills of such levy for each of such years shall be appropriated by the legislative assembly for the support, maintenance and improve-

ment of the State University at Missoula, the State College of Agriculture and Mechanic Arts at Bozeman, the Montana State School of Mines at Butte, and the Montana State Normal College at Dillon, now comprised in the University of Montana."

The title of the bill resulting in this section reads as follows: "A bill to enact by the initiative a law to increase the rate of taxation on real and personal property for state purposes one and one-half (1½) mills on each dollar of valuation for a period of ten years, beginning with the year 1921, and to authorize and empower the legislative assembly to levy a tax for each year during such period of not exceeding three and one-half (3½) mills on each dollar of valuation, and to appropriate the money derived from one and one-half (1½) mills of such levy for each year during such period for the support, maintenance and improvement of the institutions now comprised in the University of Montana." (See Laws 1921, p. 700.)

For the fiscal year mentioned above the Nineteenth Legislative Assembly levied a tax of three and one-half mills, and in making its appropriations for said year, appropriated approximately the estimated receipts from one and one-half mills thereof to the four institutions named in the section, and in addition thereto appropriated substantial sums from the general fund of the state for the maintenance of the state agricultural experiment station and substations and for the agricultural extension service.

It further appears that in 1925 the state board of examiners declared that, in the judgment of the board, the agricultural experiment station and the agricultural extension service are parts of the agricultural college, and entitled to share in the one and one-half mill portion of the state levy, and declared that the expenditures of the combined units of the University of Montana, as the same was, in their judgment, constituted, would be confined to the receipts from such one and one-half mills on each dollar of valuation. Pursuant to this resolution, in December, 1925, the board audited and allowed one claim

against the experiment station and one against the extension
service, and ordered the state auditor to draw warrants there-
for, payable out of the said receipts from the one and one-
half mill levy, which was kept in a separate account by the
state treasurer. This application resulted. Further pertinent
facts will sufficiently appear from the discussion of the ques-
tions raised.

On the filing of the application an order to show cause was
issued out of this court. In response to the order the defend-
ants filed herein a motion to quash the same upon the grounds
and for the reason stated that the complaint does not state
facts sufficient to. constitute a cause of action or to entitle
the plaintiff to the relief demanded. On January 18, 1926,
the matter was fully presented to this court and submitted
for its decision.

The attorney general, appearing for all of the defendants,
contends in support of the motion to quash:

(1) That section 2148 constitutes an amendment to section
9, Article XII, above, and is therefore void as a violation of
section 9 of Article XIX of the Constitution.

(2) That the title to the Act contains two subjects and
therefore violates section 23 of Article V of the Constitution.

(3) That the Act appropriates money in violation of the
constitutional inhibition contained in section 12 of Article
XII of the Constitution.

(4) That the agricultural experiment station and the ag-
ricultural extension service are parts of the agricultural col-
lege, and that all of the institutions named comprise the
University of Montana.

(5) That appropriations for the University of Montana are
limited to the receipts from the one and one-half mill levy,
and, as the total appropriations mentioned are in excess of those
receipts, the appropriation measures are void as contravening
section 12 of Article XII of the Constitution.

(6) That the board of examiners had the power and au-
thority to scale the appropriations and thus limit the expendi-

tures of the University of Montana to the funds available for
its support and maintenance.

1. Section 9, Article XIX of the Constitution, invoked by
[1] defendants, reads in part: "Amendments to this Constitu-
tion may be proposed in either house of the legislative assembly,
and if the same shall be voted for by two-thirds of the mem-
bers elected to each house, * * * shall be submitted to
the qualified electors of the state for their approval or re-
jection," *etc.*

In reserving to themselves power to propose laws, the people
expressly excepted "laws for the submission of constitutional
amendments" (sec. 1, Art. V, Const.), and, had they not
done so, the above mandatory direction as to how such amend-
ments shall be proposed and made would be sufficient to
prevent the people from amending any section of the Consti-
tution without the same being first proposed in one or the other
house of the legislative assembly and receiving a two-thirds
majority vote in each of said houses before its submission
to the people. As this was not done in the instant case and
the initiative measure changed the rate of taxation, the at-
torney general contends that the Act did amend the Consti-
tution, or attempted to do so, and is therefore void.

Had section 9 of Article XII merely provided that the rate
of taxation "shall never exceed two and one-half mills; and
whenever the taxable property of the state shall amount to
* * * $600,000,000.00 * * * the rate shall never exceed
two mills," or, in other words, had the Constitution thus
fixed a flat rate of taxation, section 9, Article XIX, above,
would apply, and any attempt on the part of the people to
change such rate without invoking the machinery provided
for amending the Constitution would have been futile.

No direction as to how an amendment to this provision of
the Constitution could be effected was necessary, as section
9 of Article XIX above amply provided for all amendments,
and had the framers of the Constitution intended to declare
that an amendment was necessary in order to change the rate

of taxation, they would have merely left the matter silent on the subject, as they did in each instance where an amendment is required.   Instead of doing so, a proviso was affixed to the section requiring a submission of the intended increase to the people.   While the phrase, "submitted to the people," is the same as that contained in section 9 of Article XIX, section 9 of Article XII is silent as to any action to be taken by the legislature in so submitting the matter, other than the denial to the legislature of the right to increase the rate without submitting the proposition to the people.

Section 1 of Article V of the Constitution provides: "The legislative authority of the state shall be vested in a legislative assembly,   *   *   *   but the people reserve to themselves power to propose laws, and to enact or reject the same at the polls, except as to laws relating to appropriations of money, and except as to laws for the submission of constitutional amendments, and except as to local or special laws   *   *   * independent of the legislative assembly."

Statutes enacted by the people directly under the initiative [2]   are of equal dignity with those passed by the legislative assembly (*State ex rel. Evans* v. *Stewart,* 53 Mont. 18, 161 Pac. 309) ; the power to legislate, exercised in either manner, is plenary (*In re Pomeroy,* 51 Mont. 119, 151 Pac. 333), and no distinction in this regard is made between the two methods of enacting laws in this state.   (*State ex rel. Goodman* v. *Stewart,* 57 Mont. 144, 187 Pac. 641.)

It was therefore immaterial whether the "submission to the people" of the proposed increase in the rate of taxation was effected by authority of prior legislative direction, resolution, or enactment, or by the initiation of the Act by the people under their reserved constitutional power to legislate independent of the legislature; if it, in all respects, complies with the constitutional requirements of a valid enactment, it became the law of the state.

2. The title to the initiative measure under consideration [3–9]   declares the purpose of the bill to be to "increase the

rate of taxation  *  *  *  for state purposes one and one-half mills for a period of ten years  *  *  *  and to authorize the legislative assembly to levy a tax for each year of said period of not to exceed three and one-half mills and to appropriate the money derived from one and one-half mills of such levy for each year of said period'' to the purpose designated.

Under the second and third contentions of defendants, the attorney general insists that the title advised the people that it was intended thereby to do three things: First, to increase the rate of taxation; second, to authorize the legislative assembly to levy annually not to exceed three and one-half mills on the dollar of valuation; third,  to appropriate by the Act itself the proceeds of the one and one-half mills of said levy, or the total increase in the rate, to the purposes designated. So reading the title, the attorney general contends that it violates the unity of title provision of the Constitution (sec. 23, Art. V), and the constitutional exception contained in the reservation of legislative power in the people (sec. 1, Art. V), and that portion of section 12 of Article XII which declares that ''no appropriation of public moneys shall be made for a longer term than two years.''

In construing this Act we must bear in mind the well-known canons of statutory construction, which apply with equal force to initiative measures as to legislative enactments. (*State ex rel. Evans* v. *Stewart, supra.*) The constitutionality of such an enactment is *prima facie* presumed, and every intendment is in favor of upholding it unless it appears unconstitutional beyond a reasonable doubt. (*State ex rel. Bonner* v. *Dixon*, 59 Mont. 58, 195 Pac. 841; *State ex rel. Pierce* v. *Gowdy*, 62 Mont. 119, 203 Pac. 1115; *Martien* v. *Porter*, 68 Mont. 450, 219 Pac. 817.)

Where two constructions are possible one of which will result in declaring an Act constitutional and the other unconstitutional, this court will prefer the former. (*State ex rel. Northern Pac. Ry. Co.* v. *Duncan*, 68 Mont. 420, 219 Pac.

638.)  While legislative construction is not binding on the courts, it is entitled to respectful consideration. (*State ex rel. Judith Basin County* v. *Poland,* 61 Mont. 600, 203 Pac. 352.)

Where two or more propositions are contained in a title, if, in the light of common sense, the propositions have to do with different subjects so essentially unrelated that their association is artificial, they are not one, but if they may be logically viewed as parts or aspects of a single plan, the constitutional requirement of unity of subject is met. (*State ex rel. Hay* v. *Alderson,* 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210.)

The unity of title required by section 23, Article V of the Constitution is served, notwithstanding the existence of many provisions in an Act, where such provisions are germane to the general subject expressed; this rule has been consistently adhered to since the decision in *Hotchkiss* v. *Marion,* 12 Mont. 218, 29 Pac. 821.

It is true that the three clauses in the title to this Act are conjoined by the particle "and," and that after the first and second there appears in the title a comma, but the measure. was designed to carry out the constitutional permission to submit to the people "the proposition to increase the rate, specifying the rate proposed and the term during which the rate shall be levied" and the purpose to be served.

In construing a statute the court must elicit the purpose and intent of the statute from the terms and expressions employed, if this is possible, calling to its aid the ordinary rules of grammar (*Jay* v. *School District,* 24 Mont. 219, 61 Pac. 250), and great weight should not be given to the position of a comma (*State* v. *Pilgrim,* 17 Mont. 311, 42 Pac. 856). Under the ordinary rules of grammar, while the particle "and" is used to conjoin two co-ordinate phrases, the chief thought in the sentence may be contained in one phrase thereof, while the thought in the second phrase is subordinate thereto, and in such a sentence it is permissible, in order to give proper em-

phasis to the chief thought, to change the phrase containing the subordinate thought to a participial phrase; but in reading this sentence, "in the light of common sense," all that is necessary in order to bring out the true meaning and intention of the people in enacting the measure is to eliminate the comma after the word "valuation"; it would then clearly appear that the chief thought contained in the sentence is that of increasing the rate of taxation one and one-half mills, which is the object of the enactment and the subject matter thereof, and, as a detail, and germane to this subject, the people then authorized the legislative assembly to do two things: First, to · levy annually, during the period named, three and one-half mills; and, second, to appropriate annually during such period the proceeds from one and one-half mills of such levy to the purposes named in the Act.

The legislature has, ever since the Act became operative, given to it this construction, for that body has each year made such levy, and then proceeded to make appropriations for the institutions named, up to the approximate amount of the receipts from one and one-half mills on each dollar of valuation of the property within the state. Under this construction of the measure, which we believe to be, not only the fair and reasonable construction of the language used, but the only construction which can be given that language under the rules above announced, the unity of title is maintained, and no violation of section 23 of Article V of the Constitution occurred.

3. As above construed, the language used in both the title [10] and the body of the Act cannot be said to violate that portion of section 12 of Article XII of the Constitution quoted, for there was no attempt made by the people to "appropriate money" for a period of ten years, or at all; they merely directed the successive legislative assemblies as to how they shall each year during that period appropriate the proceeds of one and one-half mills of the levy made, authorizing that body to make the appropriations for the succeeding two years.

Whether this direction to the successive legislative assemblies for the term specified is binding upon those bodies is a question which we need not now decide. The Act by its terms assumes that it will be necessary for such appropriations to be made at each successive session of the legislature, thus leaving all legislative action for that purpose in their hands, and, up to the time of the commencement of this action, each legislative assembly has followed the direction contained in the Act in making appropriations, as will more fully appear hereinafter.

4. The determination of the fourth question presented will [11] require a review of the history of the institutions under consideration.

What is termed "The Greater University" in this state, was created by the enactment of Chapter 92 of the Laws of 1913, now appearing as section 852 of the Revised Codes of 1921, which provided that "from and after the first day of July, 1913, the State University at Missoula, the College of Agriculture and Mechanic Arts at Bozeman, the School of Mines at Butte, and the Normal College at Dillon, and such departments of said institutions as may hereafter be organized, shall constitute the University of Montana."

It will be noticed that each institution described is referred to as a "university," "college," or "school," and that any further addition to the university shall be but "departments" of these institutions which may be thereafter "organized." The terms "school," "college," and "university" convey the same idea, differing only in grade. Each indicates an institution of learning, consisting of "trustees, teachers and scholars, making up the membership of the institution and representing its active work"—an institution engaged in imparting knowledge to resident students and possessing the right to confer degrees (*Northampton County* v. *Lafayette College*, 128 Pa. 132, 18 Atl. 516; *Commonwealth* v. *Banks*, 198 Pa. 397, 48 Atl. 277; *Yale University* v. *Town of New Haven*, 71 Conn.

316, 42 Atl. 87) ; a place where a collection of students is contemplated (*Stanwood* v. *Pierce*, 7 Mass. 458).

This Act, then, included within the University of Montana those institutions which are now termed "teaching units"; it does not mention any "departments" of these schools, colleges, universities, though such then existed, and, if the agricultural experiment station be a department of the agricultural college, it then existed as such; for it was created prior to the passage of the above Act, as will be hereafter seen, but the Act does provide for the inclusion of departments "thereafter organized."

Prior to 1913, the "State University at Missoula," the "College of Agriculture and Mechanic Arts at Bozeman," the "School of Mines at Butte," and the "Normal College at Dillon," existed as separate and distinct institutions duly created by law, and each had been placed under the supervision and control of the state board of education. For the purpose of this opinion it will be necessary to go further into the history of the agricultural college only, as, if the action of the state board of examiners can be upheld, it is upon a finding that the "agricultural extension service" and the "agricultural experiment station" constitute integral parts of this institution.

The inception of agricultural colleges, agricultural experiment stations, and agricultural extension service is found in the Acts of Congress next noted. In the Compiled Statutes of the United States (1916) the authorization for the creation of these three aids to the industries named is treated under "Title 56–H" with the caption "Agricultural Colleges and Experiment Stations." The title is then divided into Chapters A and B. Chapter A is entitled "Agricultural Colleges," but there is included in this chapter those enactments providing for the "co-operation by agricultural colleges, in extension work, with the [U. S.] department of agriculture"; in other words, the extension "service" as we know it. However, in so doing, the chapter first takes up and exhausts the sub-

ject of the colleges, and then devotes several sections to the extension service. Chapter B deals exclusively with, and is entitled, "Agricultural Experiment Stations."

Under Chapter A we find that, by an Act of Congress approved July 2, 1862, and subsequent Acts supplemental thereto, the United States granted certain public lands to the several states and territories which might thereafter "establish colleges for the benefit of agriculture and the mechanic arts." (See sec. 8870, Comp. Stats. 1916, and notes thereto.) The beneficiaries of these provisions are declared by Congress to be those colleges " * * * where the leading object shall be without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the states may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions." On accepting the grant by the establishment of a college or colleges with the above "leading object" in teaching, the state in which such college or colleges shall be established takes the property so granted charged with the duty to devote it to the purposes named in the Acts. (*Wyoming ex rel. Agricultural College* v. *Irvine*, 206 U. S. 278, 51 L. Ed. 1063, 27 Sup. Ct. Rep. 613 [see, also, Rose's U. S. Notes], affirming judgment in 14 Wyo. 318, 84 Pac. 90.)

By an Act approved May 8, 1914 (now sec. 8877a, Comp. Stats. 1916), Congress declared that "in order to aid in diffusing among the people of the United States useful and practical information on subjects relating to agriculture and home economics, and to encourage the application of the same, there may be inaugurated in connection with the college or colleges in each state now receiving, or which may hereafter receive, the benefits of [the Act of July 2, 1862, and Acts supplemental thereto] agricultural extension work which shall be carried on in co-operation with the United States Department of Agriculture."

The object of this "extension work," in contradistinction to the agricultural colleges (which is to *teach* certain subjects to pupils or students in attendance), is declared by section 2 of the Act (see sec. 8877b, Comp. Stats. 1916), as follows: "Co-operative agricultural extension work shall consist of the giving of instruction and practical demonstrations in agriculture and home economics *to persons not attending or* resident in said colleges in the several communities and imparting to such persons information on said subjects through field demonstrations, publications, and otherwise; and this work shall be carried on in such manner as may be mutually agreed upon by the Secretary of Agriculture and the state agricultural college or colleges receiving the benefits of this Act." The Act then provides for annual appropriations by Congress for this work and the manner in which and by whom such appropriations shall be received and used. The Act is known as the "Smith-Lever Act."

Chapter B. The establishment and maintenance of agricultural experiment stations was provided for by the Acts of Congress approved March 2, 1887, and March 16, 1906. (See secs. 8878 to 8897, both inclusive, Comp. Stats. 1916.) Section 1 of the Act of 1887 provides that "in order to aid in acquiring and diffusing among the people of the United States useful and practical information on subjects connected with agriculture, and to promote scientific investigation and experiment respecting the principles and applications of agricultural science, there shall be established, under direction of the college or colleges or agricultural department of colleges in each state [established under the Act of July 2, 1862] * ' * * '*a department* to be known and designated as an agricultural experiment station.' " The scope of the work of this "department," differing in nature from that of the "extension service," but like it disseminated to persons not attending or resident in the colleges, is set forth in sections 8879 and 8880, Compiled Statutes of 1916, and consists in research work and scientific experiments for the purpose of discovering the cause of, and

remedy for, diseases in plants and animals, the food values of different products, the composition of soils, *etc.*, and the diffusion of the information thus secured by means of bulletins and publications (sec. 8882, Comp. Stats. 1916); the supervision of all such stations is vested in the United States Secretary of Agriculture (sec. 8881, Comp. Stats. 1916). The Morrell Act of 1890 (26 Stats. at Large, 417), amended in 1907 (34 Stats. at Large, 1281 [U. S. Comp. Stats. 1916, sec. 8877]), authorized Congress to make annual cash appropriations in aid of these activities.

In 1893, long prior to the provision made for "agricultural extension service," our legislature, in order to secure to this state the benefits of the foregoing enactments of Congress, passed an Act entitled: "An Act providing for the location and establishment of the Agricultural College of the State of Montana, and an agricultural experimental station in connection therewith." (Laws of 1893, p. 171.) Section 1 of this Act established the State College of Agriculture and Mechanic Arts at Bozeman as an institution where resident students should be instructed in those branches of learning set forth in the congressional Act as the "leading object" of such colleges, in the language of the Act of July 2, 1862. By succeeding sections of this Act of 1893, down to section 7 thereof, the legislature then provided for the selection of the site and location of the "college," its management, organization and equipment, and vested the supervision and control of the college in "the state board of education," with the immediate direction and control in an executive board of the college, and authorized the state board to accept, in the name of the state, the gifts of land and money provided for in the Acts of Congress mentioned, which "shall be taken and held for the sole use and benefit of said agricultural college and agricultural experiment station." After fully providing for the "college," the legislature then, and not until then, provided for the establishment of the "experiment station" by the enactment of sections 7 and 8 of the Act of 1893.

Section 7 reads, in part, as follows: "There is also located and established on the lands so to be selected  *  *  *  [as the location of the 'college'] in connection with said agricultural college, and under its direction an agricultural experimental station." The purpose of this institution is declared to be as in the Act of Congress directed, and emphasizes the fact that the knowledge and information acquired by research and experiment is to be diffused to the people of the state of Montana in the manner designated, and not to students attending and residing at the college.

Section 8 provides, as does the section referred to the "college" (sec. 3), that this activity "is hereby placed under the supervision and control of the state board of education," but with the addition, "and the executive or subordinate board or authority who may be by the governor, by and with the consent and advice of said state board of education, appointed."

It will be noted, however, that Congress has, at least to a certain extent, placed the supervision and control of this institution in the hands of the Secretary of Agriculture of the federal government; we say "to a certain extent," for, while the title to section 8881, Compiled Statutes of 1916, is "Supervision of Stations by Secretary of Agriculture," the wording of the section is: "It shall be the duty of the [Secretary] to furnish forms, as far as practicable, for the tabulation of results of investigation or experiments; to indicate, from time to time, such lines of inquiry as to him shall seem most important; and, in general, to furnish such advice and assistance as will best promote the purpose of this Act." Thus, while the federal government does not seek any part in the control and management of the "colleges" authorized to be established under the Act of 1862, it does reserve at least an advisory control over the operation of the "experiment stations," and, with reference to the agricultural extension service, it goes further by placing that activity directly under the supervision and control of the Secretary of Agriculture, and declares that its work shall be carried on in such manner as shall be agreed

upon between the Secretary of Agriculture and the colleges receiving the benefit of the Act, without reference to the state board of education in either instance.

By Chapter 76, Laws of 1913, the legislature designated the treasurer of the executive board of the agricultural college as the person to receive appropriations from the government, and authorized such board to expend the proceeds, but only for those purposes for which the appropriations are made.

In 1915 our legislature provided for the acceptance of the benefits of the Smith-Lever Act (Chap. 19, Laws of 1915), which Act constitutes all that has been done by the state with reference to the "extension service."

Since the establishment of the experiment station in connection with the agricultural college, certain substations have been established at other points in the state, and the work outlined in the Acts creating such institutions has been carried on under the direction and supervision of the "college" and of the United States Secretary of Agriculture, in the main through experts not connected in any manner with the imparting of knowledge through teaching in the college, but a part of this work is done by teachers employed on the regular college staff, but where such is the case, these teachers receive a salary for the work so performed separate and apart from their salary for teaching, and the lands of the college used by the experiment station are separated from the college proper, and a rental therefor is charged to and paid by the experiment station as part of its maintenance expenses.

In codifying our laws in 1895, 1907 and 1921, those in charge of the work, like the compilers of the statutes of the United States, considered these institutions as separate and distinct, or, at least determined that, for some sufficient reason, the provisions creating them should be separated. Section 1 of the Act of 1893 now appears as section 889, section 7 of the Act as section 891, and the acceptance of the Smith-Lever Act as section 895 of the Revised Codes of 1921.

At each session of the legislature since the creation of these institutions within the state, there has been appropriated a certain sum for the maintenance of each of these institutions established for the purpose of instructing students attending therein, both before and after the creation of "The Greater University," which appropriations have been made uniformly as parts of one bill, and by separate appropriation bills money has also been appropriated for the support, in part, of those other institutions whose purpose is research and experiment and the diffusion of the knowledge obtained thereby through bulletins, publications, and the like, but not engaged in teaching.

Since the enactment of the initiative measure under consideration, each legislative assembly has likewise made separate and distinct appropriations, after making the levy authorized first, in one appropriation bill to the extent of the estimated receipts from the one and one-half mills of the levy, for the operation and maintenance of the "teaching units of The Greater University"; and second, by a separate appropriation bill for the support of the experiment station and substations and the extension service. Thus the Nineteenth Legislative Assembly first made a three and one-half mill levy for each of the years 1925 and 1926 (Chap. 48, Laws 1925, p. 62), and then proceeded to enact House Bill No. 453 (p. 446, Laws of 1925), entitled, "an Act appropriating money for the operation and maintenance of the teaching units of the Greater University * * * for the period beginning July 1, 1925 and ending June 30, 1927"; the Act designated the four institutions named in the initiative measure and in the Act creating "The Greater University," and appropriated to these institutions an aggregate of $688,000 for each of the fiscal years embraced within the above-described period, and upon estimated receipts from one and one-half mills of the levy of approximately $700,000, so that the appropriations thus made fall within the estimated receipts from that portion of the annual levy directed by the measure to be appropriated for

the purpose named therein, with barely a safe margin for shrinkage. The legislature then, by a separate appropriation bill (House Bill No. 451, p. 440, Laws 1925), appropriated, for each of said years, $112,323 for the operation and support of the agricultural experiment station, and the sum of $80,560 "for the farmers' extension work in co-operation with the federal government." These appropriation bills were both approved by the governor on March 16, 1925.

While no separation of the one and one-half mills from the remaining two mills was made in the levy by the legislature, this separation was made by the appropriations made from the receipts, and we are informed by the record that the state auditor made separate annotation of the receipts, and the state treasurer kept a separate account of the receipts therefrom in the books of his office. It further appears that the state board of examiners have, up to the action resulting in this proceeding, recognized the distinction and separation in passing upon claims against the several institutions and ordering warrants drawn and paid from the separated funds; in fact, their last action referred to recognized this separation but directs the payment of the warrants to be drawn in favor of the experiment station and extension service out of the funds received from the one and one-half mill levy.

It is therefore apparent that a distinction between the "teaching units" and the research and experiment and general dissemination units has always been recognized by the legislative and executive departments of both the federal and state governments in construing the several acts authorizing and establishing the several institutions, and, while such construction so placed on the Acts in question is not binding upon the courts, it is an aid to the determination of the intention of the people in enacting the laws under consideration and is "entitled to respectful consideration." (*State ex rel. Judith Basin County* v. *Poland, supra.*)

The diligence of eminent counsel for the respective parties to this proceeding has disclosed but one case in the United

States wherein this question has been touched upon by a court of last resort, and we, by independent research, have been no more successful than were they. In that case (*Indiana State Board of Finance* v. *State,* 188 Ind. 36, 121 N. E. 649), it appears that Purdue University is the agricultural college of Indiana; that that state has also taken advantage of the Acts of Congress providing for an agricultural station in connection with that institution, and has also accepted the benefits of those Acts creating the agricultural extension ser- vice. Certain annual appropriations had been made prior to 1913 for the support and maintenance of the experiment sta- tion and extension service, supplementing the appropriations of Congress. In 1913 the legislature of Indiana provided for a fixed levy for the support of the educational institutions of the state, and apportioned the tax to the Indiana University, Purdue University and the state normal school, and provided that when the funds should become available they should con- stitute the total amounts to be paid out of the state treasury to said institutions, and, with certain exceptions, repealed all Acts in conflict. The plaintiff contended that the Act repealed certain Acts providing for the appropriation for the experiment station and extension work, and that these institutions should thereafter have only such portions of the funds of the educa- tional institutions as the management thereof should apportion to them. After calling attention to the manner in which funds for these institutions had been theretofore provided by the gen- eral government and the state legislatures, and that they had always been kept separate and apart from the educational insti- tutions, the supreme court of Indiana said: "If this theory is adopted, we find a complete abandonment by the state of a long continued purpose that this bureau [the extension service] shall be independent as to funds, and as to the extent of its work, and for that purpose the expenditure of its funds shall be subject to the judgment of others than said trustees. In our opinion the trustees, or the treasurer of the University, are only designated as agents for the specific purpose of holding

such special funds, and are not acting in their general capacity as officers of the University. A prohibition of payment to the University of other than the tax, for any purpose, does not prevent a payment to the trustees as such special agents. * * * " And again: "This appropriation of $30,000 in controversy cannot, in view of the foregoing provisions, be found to be to the University for university purposes, * * * the workers, lecturers, and so forth, to whom it is paid out are not employees of the University. The county funds appropriated for local expenses do not concern the accounts of Purdue University, and yet they are in aid of the work to be done by the extension bureau." And with reference to an appropriation to the experiment station, the court said: "It is not an appropriation to the University as a university, but as a trustee for such station, and the Tax Act of 1913, * * * neither repeals this provision for the station, nor changes the organization of its management. That neither the extension bureau nor the experiment station is deemed such part of the University that the mill tax is intended therefor to the exclusion of earlier appropriations is emphasized by the fact that the state at the same session, 1913, at which it passed the Mill Tax Act in question created other such departments, or bureaus, and made certain annual appropriations therefor to operate in the future."

It is contended by the attorney general that, by the Act of 1887, Congress created the experiment station a "department" of the agricultural college; he draws that conclusion from the phrase found in the Act, as quoted above: "There shall be established, under the direction of the college or colleges in each state or territory * * * a *department* to be known and designated as 'an agricultural experiment station.' "

But in spite of the phraseology used, the experiment station in this state was not *created* by the Act of Congress; it was but authorized, and would never have come into being but for the Act of our legislature above quoted, creating that institution. Had Congress intended, by that Act, to create

within the agricultural colleges of the several states a department to be known as "an agricultural experiment station," it would have found fitting words and phrases for saying so; what it does say is that "there shall be established, *under the direction*" of such colleges, a "department" to be so known and designated.

But again, when our legislature passed the Act of 1893 above, taking advantage of the Act of Congress, *supra,* it clearly indicated its intention that the experiment station should not be a part of, or a department in, the agricultural college, for it provided for the creation of the two in a single Act, but kept them separate and apart, declaring first the establishment of the college, and then deliberately, and after it had concluded its provisions for that institution, its purpose declared to be that of teaching the subjects enumerated, provided that: "There is *also* located and established on the land * * * in connection with said agricultural college, and under its direction an agricultural experiment station."

As to the agricultural extension service, that would seem to be almost entirely a federal project; we but assented to its creation within our midst and agreed to "accept" its benefits and donate to its support.

The word "also" means "in addition to," and denotes that something is added to what preceded it. (*Panton* v. *Tefft,* 22 Ill. (12 Peck) 367; *Reynolds* v. *Washington Real Estate Co.,* 23 R. I. 197, 49 Atl. 707; *Dalton* v. *Bowker,* 8 Nev. 190; *State* v. *Camp Sing,* 18 Mont. 128, 56 Am. St. Rep. 551, 32 L. R. A. 635, 44 Pac. 516.) In the above Montana case this court said that this word in section 1, Article XII of the Constitution, providing that the legislative assembly shall levy a uniform rate of assessment and taxation for the raising of necessary revenue of the state, and that it may also impose a license tax, is used in the sense of a conjunctive, and will not to be held to carry over into the sentence the idea of the sentence which precedes it, and therefore the second sentence, connecting up the power of the legislature contained in the

first by the word "also," does not mean that a license tax is restricted to the purposes mentioned and for which a uniform tax may be levied. So here, the use of the word effects a differentiation in the two purposes declared in the Act, and does not mean that the experiment station is established for the purposes for which the college is established, "the idea" contained in the first sentence is not carried over to the second, and the separation of the two must be held to have been done by that body with a definite purpose and intent not to make the two parts of the whole, but separate and distinct entities, the second merely established upon the grounds and "in connection with" the first, which is the phrase used in both the federal and the state Acts.

Reverting to the Act under consideration (Initiative Measure No. 18, Laws of 1921, p. 700) the phraseology used is significant. The closing phrase of the title is " * * * for the support, maintenance and improvement of the institutions now comprised in the University of Montana"; the body of the measure then declares that the money derived from one and one-half mills of the levy "shall be appropriated * * * for the support, maintenance and improvement of the State University at Missoula, the State College of Agriculture and Mechanic Arts at Bozeman, the Montana State School of Mines at Butte, and the Montana State Normal College at Dillon, now comprised in the University of Montana."

While the title to the measure might be said to be more comprehensive [12] than the body thereof, it is the wording of the body and not that of the title which controls, as it is not necessary that the title shall contain or embody the exact limitations or qualifications contained in the bill itself which are germane to its purposes, if the general subject of the measure is clearly expressed in the title. (*State* v. *Anaconda Copper Min. Co.*, 23 Mont. 498, 59 Pac. 854.) We will consider, therefore, only the measure itself as it appears as section 2148 of the Revised Codes of 1921; the title has served its purpose and has been heretofore disposed of.

In wording the measure as they did, the people either considered that those federal aid projects, operated "in connection with the agricultural college," were not a part of the college or, by the peculiar wording of the measure, intentionally left them out of participation in the receipts to be derived from the one and one-half mills of the levy authorized. Had it been the intention of those drafting the measure that all institutions in any manner connected with, or a part of, the "Greater University," should share in the proceeds of the levy there would have been no necessity for an enumeration of those institutions within the University which were to have appropriated to them a part of such levy; the measure would have merely followed the wording of the title thereto, or have been even more comprehensive as "for the support, maintenance and improvements of" the University of Montana, or, as the foregoing analysis of the Acts of Congress and of our legislature relating to these nonteaching units discloses that their supervision and control is, to a great extent, divergent from that of the teaching units, and the funds provided for their support and maintenance are derived from the two sources, *i. e.*, the federal government and state appropriations; the federal aid being paid to the treasurer of the agricultural college in trust for the purposes designated—and this aid is given only on the implied condition that the state will appropriate for the same purpose sufficient additional funds to carry out those purposes—it would seem that, had the people intended that these nonteaching units should participate in the benefits of the funds provided by the Act under consideration, they would have enumerated those units in the measure. That they did not so enumerate those units is apparent, and, if they considered those units a part of the University, it cannot be said that the people intended to include within the benefits of the Act all units of the University; those units enumerated are declared to be "*comprised in* the University of Montana"; this language is significant. "Comprise" is synonymous with "include." (Webster's Dictionary; *Farmers' National Bank*

v. *Cook,* 32 N. J. L. 347.) Reading the phrase, then, as "included in the University," the phraseology leads to the irresistible conclusion that, by the inclusion of those units enumerated, any and all other units which may be a part of the University are excluded. "*Expressio unius est exclusio alterius.*" (*State* v. *State Board of Equalization,* 56 Mont. 413, 441, 185 Pac. 708.)

We are therefore forced to the conclusion, as was the supreme court of Indiana in *Indiana State Board of Finance* v. *State,* above, that appropriations made to the experiment station and extension service are not made to the University as such, but, with the federal appropriations, are held in trust by the officers or boards in charge for the use of these two institutions or activities, and can only be expended for those purposes specified, and that, while these institutions are closely associated with and conducted "in connection with" the agricultural college, they are not, in a legal sense, component parts or departments of the college.

It therefore follows that the appropriations made by House Bill 451 cannot be charged to the receipts from the one and one-half mills of the levy for 1925 and 1926, which are entirely appropriated, or nearly so, by the appropriations made by House Bill 453 for the support and maintenance of the teaching units designated in section 2148.

5. In making the appropriations mentioned, the legislature [13] recognized and followed the direction of the people contained in the measure. Without determining that such direction is binding upon that body, it is apparent that, if the one and one-half mills of the levy is the "total tax then provided by law and applicable to such appropriations and expenditures" of the four teaching units of the University, those appropriations and authorized expenditures do not exceed such total tax, and therefore those appropriations and authorized expenditures do not violate the provisions of section 12 of Article XII of the Constitution, and the governing boards and officers having authority to do so are entitled to expend the moneys so

provided for the purposes mentioned in the appropriation bill; unless some restriction upon their expenditures is found in the Constitution or statutes of the state.

There is no showing made in the record of the total appropriations against the state levy for the fiscal years of 1925 and 1926; the only appropriations referred to therein are those mentioned above. We have, however, the record of the total levy made, and from this it appears that, in addition to the estimated $700,000 to be received from the one and one-half mills of the levy, the state would receive for each of those years an additional $933,333.33, from which the legislature appropriated approximately $200,000 for the support and maintenance of the experiment stations and extension work, leaving a balance for general state purposes of approximately $733,300. It does not therefore appear from the record that any portion of the appropriation for these purposes is in any manner illegal or unconstitutional; and again, unless we find in the Constitution or statutes some restriction upon their expenditures, this amount must be set apart for the accomplishment of the purposes for which those institutions were created and are maintained.

6. Lastly, the attorney general does not contend that the state [14] board of examiners has power to scale appropriations which have been made in accordance with all of the constitutional restrictions and regulations, or to curtail the expenditure .of the amount so legally appropriated by the legislature for the support and maintenance of the several institutions mentioned, but asserts that, under section 269, Revised Codes of 1921 "it is proper for the board of examiners to announce its policy to hold different officers, institutions, and departments to the amount appropriated to such officers, institutions and departments." Explaining that the board concluded that the legislature undertook to appropriate, to the institutions named in section 2148 above, the amount to be derived from the levy of one and one-half mills, and that the extension service and the experiment station were parts of those institu-

tions, he contends that, on this conclusion, the board was justified in treating the excess of the appropriations above the proceeds of the one and one-half mills as a nullity, and holding the entire University expenditures down to the total amount of such receipts.

Had we arrived at the conclusion on which the board based its action in prorating the amounts available to the several institutions in order to include the total available fund within the receipts from the one and one-half mills of the levy, the question might be presented whether the action of the board was within its authority as a constitutional board vested with "power to examine all claims against the state, except salaries or compensation of officers fixed by law, and to perform such other duties as may be prescribed by law" (section 20, Art. VII, Const.), for the legislature has, "by law" prescribed the duties of the board with considerable particularity, especially with reference to the very institutions with which the board was attempting to deal, and which provisions are as follows:

Section 850, Revised Codes of 1921: "The state board of examiners * * * shall have supervision and control of all expenditures of all moneys, appropriated or received for the use of said [educational] institutions from any and all sources, other than that received under and by virtue of the Acts of Congress * * * shall let all contracts * * * and shall audit all claims to be paid from any moneys, * * * but * * * shall have authority to confer upon the executive boards of such institutions such power and authority in contracting current expenses, and in auditing, paying, and reporting bills for salaries or other expenses incurred in connection with such institutions, as may be deemed by said state board of examiners to be to the best interest of said institution."

Section 250: "Whenever the board has reason to believe that the state auditor has drawn or is about to draw his warrant without authority of law, or for a larger amount than the state

actually owes, the board must notify the state treasurer not to pay the warrant so drawn; * * * and thereupon the treasurer is prohibited from paying the warrant, whether already drawn or not, until he is otherwise directed by the legislative assembly or the board."

Section 269: "No state officer, state board of trustees, or managers or commissioners shall have any authority to, or shall contract any liability or indebtedness whether in excess of the amount appropriated to such officer, board of trustees, or managers or commissioners, or for the office, institution, commission, or organization under his or their management or control, without previous authorization from the state board of examiners, and if any liability or indebtedness be incurred or expenditure be made, in violation of this Act, no claim therefor shall be allowed by the state board of examiners."

These sections show the extent of the authority of the board of examiners concerning the expenditure of public funds. When the board of examiners has exercised the powers conferred upon it by the Constitution and legislative enactments of the state, its functions are ended. (*State ex rel. Schneider* v. *Cunningham,* 39 Mont. 165, 101 Pac. 962; *Porter* v. *Hartley,* 67 Mont. 244, 216 Pac. 344.) While this board is given supervision and control over the expenditures of moneys appropriated or received for the use of the educational institutions of the state, this power does not authorize an arbitrary reduction by the board of valid appropriations and authorized expenditures from available funds applicable to such appropriations and expenditures which have been duly made and authorized by the legislative assembly and have received the approval of the governor. Such attempted substitution of the judgment of executive officers for that of the legislative body constitutes a usurpation of legislative functions which cannot be permitted under our constitutional division of state government into its three co-ordinate departments; the authority to do so was denied the governor in the exercise of his veto power in *Mills*

v. *Pôrter,* 69 Mont. 325, 35 A. L. R. 592, 222 Pac. 428, and there is much less reason for sustaining the exercise of such power by an executive board. When the legislative assembly has expressed its solemn judgment as to the amount necessary for the support and maintenance of an institution for the fiscal year, and in doing so has kept within the restrictions imposed by the Constitution both as to such general appropriation and its appropriations generally for such year, the executive and judicial departments of the state must bow to that judgment.

However no question is here presented as to the power of the board of examiners to refuse to approve claims for expenditures, made or to be made, in excess of available or anticipated revenues, nor as to its authority to prorate appropriations, where it is apparent that the legislature has exceeded its constitutional power in making appropriations beyond the amount of funds available in the state treasury, or anticipated revenues subject to appropriation and applicable to such appropriations or expenditures. As to this and other kindred questions, we expressly reserve opinion.

7. As the reasons stated by the board for its action in ordering the payment of the two claims allowed out of the proceeds of the one and one-half mills of the state levy, so appropriated for the support and maintenance of the four institutions mentioned, are not justified by the analysis of the provisions governing the matters under consideration, the action of the board in this respect must fall with its conclusions on the subject.

It is apparent from the foregoing discussion that the complaint states a cause of action, and that the plaintiff is entitled to the relief he seeks; the motion to quash is therefore overruled. It is accordingly ordered that the defendants be perpetually enjoined and restrained from paying or directing the payment of the claims herein referred to out of the proceeds of the said one and one-half mills of the state levy so appropriated for the period mentioned for the support and maintenance of the "teaching units of The Greater University," and from

drawing any warrant or warrants against such proceeds for the payment thereof.

*Writ granted.*

MR. CHIEF JUSTICE CALLAWAY·· and ASSOCIATE JUSTICES HOLLOWAY, GALEN and STARK concur.