No. 81-45

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

MONTANA AUTOMOBILE ASSOCIATION,
BUFFALO MACHINERY COMPANY et al., and MONTANA CHAMBER OF COMMERCE,

Plaintiffs and Respondents,

vs.

MIKE GREELY, ATTORNEY GENERAL OF THE
STATE OF MONTANA, and PEG KRIVEC,
COMMISSIONER OF POLITICAL PRACTICES,

Defendants and Appellants.

---

ORIGINAL PROCEEDING:

Counsel of Record:

For Appellants:

Hon. Mike Greely, Attorney General, Helena, Montana
Richard Larson argued and Mary B. Troland argued,
Assistant Attorney General, Helena, Montana
Jack Lowe, Helena, Montana

For Respondents:

Donald garrity argued, Helena, Montana

For Amicus Curiae:

James Goetz, (A.C.L.U.), Bozeman, Montana
James W. Zion, (A.C.L.U.) Helena, Montana
Kelly Alan Jenkins, (Common Cause) Helena, Montana

---

Submitted: March 27, 1981

Decided: July 30, 1981

Filed: JUL 30 1981

Thomas J. Kearney

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Initiative No. 85[1], Lobbyist Disclosure, (herein called "I-85" or "the Initiative") was held to be unconstitutional by the District Court of the First Judicial District. Defendants, the state attorney general and the commissioner of political practices of the State of Montana, were permanently enjoined from enforcement of I-85. Defendants appeal from the judgment. We hold that the Initiative in part is unconstitutional and void, and that the balance of I-85 is sufficient to carry out the purposes of the Act and, therefore, remains in effect. This opinion does not rule upon the applicability of I-85 to lawyers, which will be decided in a separate opinion, State Bar of Montana v. Krivec, Supreme Court Docket No. 81-35.

Chapter 157, Laws of Montana (1959), entitled "Lobbying", was enacted in 1959 and codified as section 43-801, et seq., R.C.M., 1947, now Chapter 7, Title 5, MCA. The Lobbying Act was enacted "to promote a high standard of ethics in the practice of lobbying, to prevent unfair and unethical lobbying practices, and to provide for the licensing of lobbyists and the suspension or revocation of the licenses." Section 5-7-101, MCA. Legislative amendments in 1965 and 1977 made minor changes in the lobbying law but did not alter its scope. Section 3, Ch. 248, Laws of Montana (1965); sections 19, 20 and 21, Ch. 309, Laws of Montana (1977). House Bill 49 and Senate Bill 233, designed to expand the Act to require disclosure of the amounts of money spent for lobbying, were introduced during the 1979 legislative session, but were killed prior to transmittal. House Journal, 46th Legislature

---

[1]See Appendix "A".

(Montana 1979); Senate Journal, 46th Legislature (Montana 1979).

In 1980, a successful petition effort resulted in the placement of I-85 on the statewide November ballot. The Initiative sought to add 13 new sections and to make numerous amendments to the existing lobbying regulation act. It also greatly expanded the "Definitions" section of the original law in an attempt to clarify the application of the law as expanded and amended. Most of the 1959 law and all of the changes proposed by I-85 were printed in the Voter Information Pamphlet for the November 4, 1980, general election. The offical vote on I-85 was 259,698 "for" and 76,358 "against".

On November 24, 1980, a declaratory judgment action was brought in the First Judicial District. The plaintiffs are associations which employ lobbyists, several individuals, and one state representative; and the defendants are the attorney general and the commissioner of political practices of Montana. An attempt by defendants to remove the action to the United States District Court was unsuccessful. On January 22, 1981, after submission of briefs and a hearing, the District Court decreed that "Initiative No. 85 is unconstitutional, null, and void, and that defendants are permanently enjoined from enforcing its provisions." The finding of unconstitutionality was based upon the Initiative's impact on numerous rights: privacy, freedom of speech, freedom of the press, freedom of association, freedom to petition the government, equal protection of the laws, and freedom from compelled self-incrimination. The Initiative was also held to be void for vagueness. The District Court found that the State had not met its burden of establishing a compelling interest that justified the infringements mentioned above, or that the State's interest could be achieved through less

restrictive means. Finally, the District Court held that the constitutionally offensive portions of the Initiative could not be severed because "the validity of the entire measure depends upon the showing of a compelling state interest and a determination that such interest may not be satisfied by legislation more narrowly drawn."

We agree with the District Court that I-85 conflicts with various constitutional rights of those affected by its provisions. However, we do not agree that there has been a failure to establish a compelling state interest for the passage of I-85. While we find that certain provisions of the Initiative are beyond redemption, the striking of those provisions does not result in a law that is incomplete or incapable of fulfilling its stated purpose.

Whether enacted by the legislature or created by the people through initiative, all statutes carry with them a presumption of constitutionality. State v. Erickson (1926), 75 Mont. 429, 438, 244 P. 287, 290. When a statute is challenged as being unconstitutional, the challenger must show that it does in fact infringe upon a right guaranteed by the Constitution. N.A.A.C.P. v. Alabama (1958), 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488. When it has been demonstrated that a statute infringes upon First Amendment freedoms, a presumption of constitutionality is no longer available. United States v. C.I.O. (1948), 335 U.S. 106, 140, 68 S.Ct. 1349, 1366, 92 L.Ed. 1849, 1870-71, (Rutledge, J., concurring). Nevertheless, restrictions of First Amendment rights may be allowed if the state can show that the challenged statute furthers a compelling governmental interest. United States v. O'Brien (1968), 391 U.S. 367, 377, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672, 679-80. Appellants agree that certain provisions of I-85 have an impact upon the

-4-

fundamental rights of those to whom the law applies. However, they argue that the District Court erred in finding that no compelling state interest had been demonstrated.

The District Court found that "[t]he Initiative itself does not recite any 'compelling state interest' in . . . disclosure . . . Defendants offered no proof to establish such a need." The court also found that the "Montana Legislature has investigative or 'fact-finding' capabilities while the Montana initiative process has no such ability." The mere recitation of a compelling state interest in the Act itself would not be conclusive. While the appellants did not present evidence to establish a compelling state interest, their briefs at the hearing below cited authority from numerous jurisdictions in which a compelling interest for similar legislation had been found to be present. Laws regulating or monitoring the raising and spending of money in the political arena have been enacted throughout the country as well as by the Congress. When these laws have been challenged, the courts have not had difficulty finding a compelling interest as a basis for enactment. United States v. Harriss (1954), 347 U.S. 612, 625, 74 S.Ct. 808, 816, 98 L.Ed. 989, 1001, (maintaining the integrity of a basic governmental process); Young Americans for Freedom, Inc. v. Gorton (1974), 83 Wash.2d 728, 522 P.2d 189, 192, (informing public officials and the electorate of the sponsors of efforts to influence governmental decision-making); Plante v. Gonzalez (5th Cir. 1978), 575 F.2d 1119, 1135, cert.den., (1979), 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90, (protecting citizens from abuse of the trust placed in the hands of elected officials); Montgomery County v. Walsh (1975), 274 Md. 502, 336 A.2d 97, 106, appeal dismissed

-5-

(1976), 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306, (fostering a climate of honesty perceptible by the public at large). Political corruption is a matter of common popular perception, which may or may not reflect the actualities of political life. Judicial notice may be taken of the compelling need for disclosure laws which have as their purpose the deterrence of actual corruption and the avoidance of appearances of corruption. Buckley v. Valeo (1976), 424 U.S. 1, 67, 96 S.Ct. 612, 657, 46 L.Ed.2d 659, 715. The absence of fact-finding capabilities in the initiative process is not proof of the absence of a compelling state interest in the enactment of I-85. To so hold would result in the emasculation of the initiative process in Montana with a result that no initiative could withstand a First Amendment challenge. We find that the statewide vote on I-85 is a demonstration of a compelling state interest in the enactment of I-85. In addition, the compelling need for this type of legislation is demonstrated by both common understanding and judicial precedent, so no additional evidence need be presented. Because we find that a compelling need for disclosure has been established, we cannot agree with the District Court that I-85 must fall in its entirety. We will now proceed to apply the severability clause of the Initiative to the end that "all valid parts that are severable from the invalid part [may] remain in effect." Section 21, I-85.

### EXCEPTIONS FOR INDIVIDUAL MONTANA CITIZENS

Section 1(2) of I-85 provides that "[n]othing in this chapter subjects any Montana citizen lobbying on his/her own behalf to any reporting requirements nor deprives any such citizen of the constitutional right to communicate with public officials." Section 2(5)(b)(i) states that "'[l]obby-ist' does not include (i) any individual Montana citizen

-6-

acting solely on his/her own behalf . . ." We find the exemption provided for <u>Montana</u> citizens constitutionally impermissible. "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." U.S. Const., art. IV, §2, cl. 1. We can discern no basis for creating an exception solely for individual Montana citizens. A citizen of North Dakota or New Jersey may have an interest in some official action in Montana that warrants his efforts to influence the outcome of that action. If the individual Montana citizen lobbying in his own behalf is immune from the reach of the Initiative, so too is the individual citizen of a sister state. Just as the privileges and immunities clause protects persons who enter other states to earn a living, Toomer v. Witsell (1948), 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460; Gordon v. Committee on Character and Fitness (1979), 48 N.Y.2d 266, 397 N.E.2d 1309, 422 N.Y.S.2d 641, it must protect persons who enter this state to assert or protect their interests before public officials. The word "Montana" is void and without effect in both sections.

DEFINITIONS OF "UNPROFESSIONAL CONDUCT"

Section 2(7) of I-85 defines "unprofessional conduct". As amended and expanded by I-85, "unprofessional conduct" now includes the following:

"(7) 'Unprofessional conduct' means:

"(a) a violation of any of the provisions of this chapter;

"(b) instigating action by any public official for the purpose of obtaining employment in opposition thereto;

"(c) attempting to influence the action of any public official on any measure pending or to be proposed by

"(i) the promise of support or opposition at any future election,

"(ii) promise of financial support

"(iii) making public any unsubstantiated charges of improper conduct on the part of any other lobbyist, any principal, or any legislator,

"(iv) any improper economic reprisal or other unlawful retaliation against any public official, or

"(v) any means other than argument on the merits thereof;

"(d) attempting to influence a decision or vote by a hearing examiner or quasi-judicial officer in any contested case proceeding under Part 6, Chapter 4, Title 2, MCA except as provided therein;

"(e) attempting to knowingly deceive any public official with regard to the pertinent facts of an official matter or attempt to knowingly misrepresent pertinent facts of an official matter to any public official; or

"(f) engaging in practices which reflect discredit on the practice of lobbying legislature."

Section 5-7-305, MCA[2], makes it a misdemeanor to violate the provisions of the lobbying law. The punishment is imprisonment in the county jail for not more than six months or a fine up to $200, or both. No person should be held criminally responsible for conduct which he could not reasonably understand to be proscribed. Palmer v. City of Euclid, Ohio (1971), 402 U.S. 544, 546, 91 S.Ct. 1563, 1564, 29 L.Ed.2d 98, 100. A statute is unconstitutionally vague when it fails to give a person of ordinary intelligence fair notice that his contemplated activity is forbidden by the statute. United States v. Dupree (9th Cir. 1976), 544 F.2d 1050, 1051. A number of the definitions of "unprofessional conduct" fail to overcome this basic hurdle. Sections 2(7)(c) (iv) and (v) prohibit attempting to influence action by any public official through improper economic reprisal,

---

[2]See Appendix "B".

-8-

unlawful retaliation, or any means other than argument on the merits. Is there a form of "proper" economic reprisal? How does a lobbyist determine when he may retaliate lawfully against a public official? And, in subsection (v), can conduct which is potentially criminal be defined as "any means other than" the single, permitted means of argument on the merits? Section 2(7)(f) prohibits "engaging in practices which reflect discredit on the practice of lobbying legislature [sic]". We need not deal with the apparent error in amendment. The words "or the" were formerly placed between "lobbying" and "legislature". We simply hold that to "reflect discredit" is not sufficiently definite to give a person of ordinary intelligence fair notice that his conduct is forbidden. Sections 2(7)(c)(iv) and (v) and section 2(7)(f) are impermissibly vague, unconstitutional, and therefore, void.

Section 2(7)(c)(i) defines "unprofessional conduct" as "attempting to influence the action of any public official on any measure pending or to be proposed by (i) the promise of support or opposition at any future election." As we read this section, the prohibited conduct is nothing more than a standard and accepted means of involvement in the political process. The only real influence that most voters can exert upon elected officials is to give or withhold their vote. When an issue comes before an elected official, it is certainly permissible for the official's constituents to express their desires as to that issue. If the issue is important enough to a voter, the official may be told that a certain action on the measure would create such disaffection that the voter could not, in good conscience, support that official in any future election. This is not a threat. It is a free expression of the only real power an elector

possesses. Criticism of government is at the very center of the constitutional protection of free speech. Therefore, criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. Rosenblatt v. Baer (1966), 383 U.S. 75, 85, 86 S.Ct. 669, 675-76, 15 L.Ed.2d 597, 605. The constitutional guaranty of free speech provides for the opportunity to persuade to action, not merely to describe facts. Thomas v. Collins (1945), 323 U.S. 516, 537, 65 S.Ct. 315, 326, 89 L.Ed. 430, 444. It is a fundamental principle of our constitutional system that the opportunity for free political expression has as its end that government may be responsive to the will of the people. New York Times Co. v. Sullivan (1964), 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686, 700, motion denied, 376 U.S. 967, 84 S.Ct. 1130, 12 L.Ed.2d 83. No law could stand which would prevent an elector from voting for or against an incumbent. Likewise, no law can stand which would prevent a voter from expressing to an elected official an intention to vote for or against that official if certain action is or is not taken. Such a restraint is impermissible under both the First Amendment to the U.S. Constitution and article II, §7 of the Montana Constitution. The restriction is no less offensive because, under I-85, it applies to "principals" and their advocates, "lobbyists". The First Amendment applies to associations, as well as individuals, and protects the right of associations to engage in advocacy on behalf of their members. Smith v. Arkansas State Highway Employees (1979), 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360. Section 2(7)(c)(i) is an unconstitutional infringement of the right of free speech and is, therefore, void.

We turn now to the final problems presented by the "unprofessional conduct" sections of the law. We note that "unprofessional conduct" embraces "a violation of any of the provisions of this chapter." Section 2(7)(a), I-85. The chapter, however, establishes certain requirements for elected officials as well as for lobbyists and principals. The law was, and still is, a measure designed primarily to regulate the activities of the lobbying profession. The conduct prohibited by section 2(7) is conduct that could be engaged in by lobbyists and possibly by principals, but we do not find that the actions of elected officials were intended to be covered by this subsection. We, therefore, construe section 2(7)(a) to limit "unprofessional conduct" to violations of any of the provisions of the chapter by a lobbyist or principal.

This brings us back to the question of the scope of activities which may be found to be "unprofessional." A "lobbyist" is "any person who engages in the practice of lobbying for hire." Section 2(5)(a), I-85. "Lobbying includes: . . . (b) the practice of promoting or opposing official action by any public official . . ." Section 2(4)(b), I-85. "'Public official' means any individual, elected or appointed, acting in his official capacity for the state or local government or any political subdivision thereof, but does not include those acting in a judicial or quasi-judicial capacity." Section 2(3), I-85. (Emphasis added.) So, in an act entitled "Lobbying", and drafted with the regulation of lobbying in mind, we have a clear indication that lobbying does not include the practice of promoting or opposing official action by a judicial or quasi-judicial public official. Despite this clear exception, section 2(7)(d) makes it a crime to attempt "to influence a decision

-11-

or vote by a hearing examiner or quasi-judicial officer in any contested case proceeding under Part 6, Chapter 4, Title 2, MCA, except as provided therein." If possible, subsections of a statute should be construed in a manner that will give effect to them all. State v. District Court of the Sixth Judicial District (1963), 142 Mont. 328, 384 P.2d 501; Section 1-2-101, MCA. This Court must reconcile conflicting statutory provisions and make them operative in accordance with the legislative intent, insofar as it is possible to do so. State ex rel. Bennick v. District Court of the 13th J. D. (1975), 167 Mont. 389, 391, 538 P.2d 1369, 1370. It is inconsistent with the intention of a law enacted to regulate lobbying to also regulate conduct that is, by the terms of the statute, not lobbying. Criminal statutes are to be strictly construed. Shipman v. Todd (1957), 131 Mont. 365, 368, 310 P.2d 300, 302. We construe I-85, as it applies to principals and lobbyists, to regulate only that conduct which falls under the definition of lobbying. Because "attempting to influence a decision or vote by a hearing examiner or quasi-judicial officer" is expressly excluded from the definition of lobbying a public official, it is irreconcilably inconsistent with the intention of the Act. It cannot be "unprofessional conduct", and no penalty may attach to such conduct by application of I-85. Section 2(7)(d) is void.

### DEFINITION OF "PRINCIPAL"

We next turn to the definition of "principal" as contained in sections 2(8)(a) and (b). "Principal" is defined in subsection (a) as any person who makes payments in excess of $1,000 per calendar year to engage a lobbyist. No question is raised with regard to subsection (a). "Principal" is

further defined as any person who makes those payments:

> "(b) in the case of a person other than an individual, to solicit, directly, indirectly or by an advertising campaign, the lobbying efforts of another person."

Subsection (b) is attacked for vagueness and infringement upon First Amendment rights under the United States Constitution and article II, section 6, of the Montana Constitution, by which the people are given the right to peaceably protest governmental action, and the following section 7 which provides that no law shall be passed impairing the freedom of speech or expression. It is difficult to determine what person or groups of persons were intended to be included under subsection (b) as "principals". Following are five examples of organizational actions which meet the subsection (b) definition of "principal":

(1) Action by union officers asking union members to support or oppose a right-to-work law.

(2) Mailing of newsletters by an organized church to members and nonmembers encouraging the reader to contact a public official on an abortion law.

(3) Activity by a farm group which suggests to farmers that they should contact state officials in order to improve grain or cattle prices.

(4) Action by any business, labor, farm, religious, social or other group requesting people to contact their legislators to assist in passage or repeal of a law.

(5) Publication or broadcast by anyone, other than an individual, of a newspaper, pamphlet, newsletter, television program, or radio program which encourages readers or listeners to contact a legislator or state official.

In examples (1) to (4), subsection (b) is challenged as being unconstitutionally vague and overbroad. We have not

been able to construe subsection (b) in a manner that meets these challenges. In United States v. Harriss, supra, 347 U.S. 612, the Supreme Court was able to narrowly construe provisions of the Federal Regulation of Lobbying Act and, therefore, find it to be constitutional. This was done to eliminate the vagueness in the Act. In substance, the Court narrowly construed the words "[t]o influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States" to be limited to "direct communication with members of Congress on pending or proposed federal legislation." United States v. Harriss, supra, 347 U.S. at 620.

In doing so, the Supreme Court relied upon United States v. Rumely (1953), 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770. In the Rumely case, the Supreme Court stated:

> "Surely it cannot be denied that giving the scope to the resolution for which the Government contends, that is, deriving from it the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process, raises doubts of constitutionality in view of the prohibition of the First Amendment." United States v. Rumely, supra, 345 U.S. at 46.

The Court then construed "lobbying activities" as being limited to representations made directly to the Congress, its members, or its committees. Subsection (b) could not be construed in this manner, as it specifically covers solicitation by a person seeking lobbying efforts by others.

The foregoing example (5) focuses on the application of subsection (b) to a newspaper, television station, radio station, pamphleteer or other publishers. Such an application constitutes an unconstitutional infringement of the freedom of the press. As stated by the Supreme Court in Mills v. Alabama (1966), 384 U.S 214, 218-20, 86 S.Ct. 1434,

1437, 16 L.Ed.2d 484, 488-89:

> "Whatever differences may exist about interpretations
> of the First Amendment, there is practically
> universal agreement that a major purpose of that
> Amendment was to protect the free discussion of go-
> vernmental affairs. This of course includes dis-
> cussions of candidates, structures and forms of go-
> vernment, the manner in which government is operated
> or should be operated, and all such matters relating
> to political processes. The Constitution specifically
> selected the press, which includes not only news-
> papers, books, and magazines, but also humble leaf-
> lets and circulars, [citation] to play an important
> role in the discussion of public affairs. Thus the
> press serves and was designed to serve as a powerful
> antidote to any abuses of power by governmental offi-
> cials and as a constitutionally chosen means for keep-
> ing officials elected by the people responsible to
> all the people whom they were selected to serve.
> Suppression of the right of the press to praise or
> criticize governmental agents and to clamor and con-
> tend for or against change, which is all that this
> editorial did, muzzles one of the very agencies the
> Framers of our Constitution thoughtfully and deliber-
> ately selected to improve our society and keep it
> free.
>
> ". . . We hold that no test of reasonableness can save
> a state law from invalidation as a violation of the
> First Amendment when that law makes it a crime for
> a newspaper editor to do no more than urge people to
> vote one way or another in a publicly held election."

Even newspaper editorials, as referred to in Mills v. Alabama, supra, would constitute lobbying activity under subsection (b). Facially, subsection (b) constitutes a more drastic infringement on freedom of the press and freedom of speech than was present in Mills v. Alabama, supra. Because subsection (b) infringes on First Amendment freedoms, it will be subject to close judicial examination. Such significant interferences with those rights may be allowed only if a compelling governmental interest is shown. United States v. O'Brien, supra, 391 U.S. 367.

We are unable to find any compelling state interest which requires the inclusion of subsection (b) in the Initiative. The fundamental purposes of the Initiative are accomplished by including, as a principal, the person who

-15-

hires a lobbyist. We find all of section 2 (8)(b) to be unconstitutional under the First Amendment to the United States Constitution, and article II, sections 6 and 7 of the Montana Constitution. It is, therefore, void.

## PROHIBITED COMPENSATION

Section 5-7-302, MCA, was amended by section 9 of the Initiative to read: "No person may be employed as a lobbyist for a compensation dependent in any manner upon the passage or defeat of any proposed or pending official action by a public official or upon any other contingency connected with such action." In the past, contingent fee agreements for lobbying services were seen as inviting and inducing improper solicitations of Congress. Hazelton v. Sheckells (1906), 202 U.S. 71, 79, 26 S.Ct. 567, 568, 50 L.Ed. 939, 941. A contingent fee agreement was considered strong evidence that the parties anticipated that improper means would be used. C. Sands, 1 Statutes and Statutory Construction §13.20 (4th Ed. 1973). We surmise that this was the public policy behind the original inclusion of section 5-7-302 in the Lobbying Act, and the reason for its retention and amendment by the Initiative. There is, of course, no constitutional protection afforded improper lobbying activities, and the State may attempt to regulate and punish any improprieties. However, even when the State has the power to regulate an activity, the power "must be so exercised as not, in attaining a permissible end, unduly to infringe [a] protected freedom." Cantwell v. Connecticut (1940), 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218. The blanket prohibition against contingent compensation of lobbyists provided by section 9 is overbroad because it precludes contingent fee agreements that are properly motivated as

-16-

well as those that are improperly motivated. Section 9 thereby violates the right to petition the government included in the First Amendment to the United States Constitution and in article II, §6 of the Montana Constitution. The ability of individuals and organizations to fully exercise their right to petition the government may be severely curtailed by this broad prohibition. We find that section 9 unduly infringes the rights of those who, while contemplating neither illegal nor unethical conduct, need or desire to employ a lobbyist on a contingent fee basis in order to advance their interests before a public official. The State may not impose so broad a limitation on the right to petition. The objectionable quality of overbreadth depends upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. N.A.A.C.P. v. Button (1963), 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418. Section 5-7-302, MCA, as amended by section 9 of the Initiative is void.

## ACCOUNTINGS

In order to accomplish its purpose of revealing money spent to influence actions of public officials, the Initiative requires principals to file accountings which detail payments made to influence official action and payments for lobbying. Section 11, I-85. A number of the provisions of the accounting section give rise to constitutional conflicts which can only be resolved by our elimination of certain of the accounting requirements. Section 11(5) dictates that:

"(5) Each accounting filed under this section shall:

"(a) list all payments for lobbying in each of the following categories:

"(i) original and derivative research (for which the cost may be estimated if necessary) done to support a lobbying argument or presentation:

"(ii) publication and distribution of each publication, except that the cost of a newsletter or leaflet distributed to the membership of a principal need not be reported unless over one-half of that newsletter or leaflet is devoted to lobbying matters; . . .

"(iv) news media;"

As we have noted, the Initiative is a penal statute. Its provisions must be sufficiently definite to give a person of ordinary intelligence fair notice that his conduct is forbidden. We find that the requirement of reporting payments for "original and derivative research" is too indefinite for a principal to ever be assured that he or she has fully complied with the section. The indefiniteness of /section 11(5)(a)(i) is demonstrated by the fact that the cost of research "may be estimated if necessary." There are so many aspects to the gathering of information for use in a lobbying effort that it would be impossible to determine when research is being done and what its cost is. Is the time spent making a phone call to an agency to obtain information "research"? Is it original and derivative? If an estimate for research costs is given, when is that estimate so inaccurate as to give rise to criminal liability? We believe that a principal cannot know for certain if he has complied with section 11(5)(a)(i), and it is, therefore, void for vagueness. The same is true of section 11(5)(a)(iv), which requires reporting of payments for "news media". Publication of newsletters and leaflets, "other" printing, and advertising, including production costs, are covered elsewhere in section 11(5)(a). We are unable to determine what additional information ought to be disclosed under the subheading of "news media." If activities of a principal or lobbyist are newsworthy, would the principal be required to report the cost of those activities? We think not, but we cannot be certain;

-18-

neither could a principal be certain.  Section 11(5)(a)(iv) is, therefore, void.

Section 11(5)(a)(ii) requires a principal to list all payments for the publication and distribution of publications over one half of which are devoted to lobbying matters. This requirement seriously infringes freedom of the press. U.S. Const. amend. I; Mont. Const. art. II, section 7. "The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, [citation], to play an important role in the discussion of public affairs." Mills v. Alabama, supra, 384 U.S. at 219. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Department of Chicago v. Mosley (1972), 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216. The requirement that only publications which devote more than one half of their space to lobbying matters need be included in accountings is regulation based upon content. It is true that it is regulation which does not amount to direct censorship. Nevertheless, evidence was presented below that the additional burden of reporting could cause certain of the plaintiffs to cease publication of their newsletters. We find this potential for indirect limitation of freedom of the press is a sufficient basis for the elimination of section 11(5)(a)(ii). The fact that advocacy may persuade the electorate is hardly a reason to suppress it. First National Bank of Boston v. Bellotti /(1978) 435 U.S. 765, 790, 98 S.Ct. 1407, 1423, 55 L.Ed.2d 707, 727. The fact that 51 percent of one publication but only 50 percent of another publication may persuade the electorate is no reason to burden the former but not the latter. Section 11(5)(a)(ii) is void.

Section 11(5)(c) requires principals to include in their accountings "each contribution and membership fee which amounts to $250 or more when aggregated over the period of one calendar year paid to the principal, regardless of whether it was paid solely for the purpose of lobbying, with the full address of each payer and the issue area, if any, for which such payment was earmarked." Required disclosure of this type of information does not automatically render a statute unconstitutional. See Young Americans for Freedom, Inc. v. Gorton, supra. However, the words "regardless of whether it was paid solely" cause section 11(5)(c) to apply so broadly as to be violative of the First Amendment right of association, which exists as a necessary corollary to the freedoms of speech and assembly. N.A.A.C.P. v. Alabama, supra, 357 U.S. at 460. "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker (1960), 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237. The forced disclosure of contributions and membership fees, "regardless of whether . . . paid solely for the purpose of lobbying", compels revelation of information that has no relationship to the ends that the Lobbying Act and the Initiative seek to achieve. Lobbying is what the State means to regulate. This regulation is not more completely accomplished by requiring an organization which engages in lobbying to divulge the names of those contributors and members whose monies were never intended to be spent on specific lobbying efforts. That those monies are in fact spent for lobbying does not lessen the repugnance of section 11(5)(c).

The forced disclosure of the name of an individual who contributed $250, even though the individual had no specific desire that the money be spent to influence official action, reaches too broadly and too blindly into an area that is essential to the exercise of our most basic freedoms. "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." N.A.A.C.P. v. Alabama, supra, 357 U.S. at 462. Unless a compelling interest exists, the State may not put a person in the position of having to reveal or explain his associational ties. A compelling interest exists under the Initiative when money is contributed "for the purpose of lobbying." Absent that purpose, the State may not, by the Initiative, cause an individual's affiliations to be made public. The words "regardless of whether it was paid solely" as used in section 11(5)(c) are void.

The final accounting requirement with which we will concern ourselves is section 11(5)(d), which requires a principal to:

> "list each political contribution, including any-
> thing of value, paid to any candidate for elective
> public office, to any committee established to
> support or oppose a candidate for elective public
> office, or to any committee to support or oppose any
> initiative, referendum, or other ballot issue,
> whether such payment is made directly or indirectly
> by the principal or any lobbyist who received com-
> pensation or reimbursement for such payment from the
> principal."

The title of the Initiative as printed in the Voter Information Pamphlet, read as follows:

"THIS PROPOSED INITIATIVE REQUIRES PUBLIC DISCLOSURE
OF MONEY SPENT TO INFLUENCE ACTION OF A PUBLIC OFFI-
CIAL. ALL INDIVIDUALS OR BUSINESSES WHO EMPLOY LOBBY-
ISTS AND SPEND MORE THAN $1000 A YEAR TO PROMOTE OR
OPPOSE OFFICIAL ACTION OF A PUBLIC OFFICIAL MUST GIVE
A COMPLETE ACCOUNTING OF ALL MONEY SPENT. THE PROPOSAL
DOES NOT APPLY TO INDIVIDUAL CITIZENS LOBBYING ON
THEIR OWN BEHALF. ELECTED OFFICIALS ARE REQUIRED TO
PUBLICLY DISCLOSE THEIR BUSINESS INTERESTS. CRIMINAL
AND CIVIL PENALTIES ARE PROVIDED FOR VIOLATIONS OF THE
PROVISIONS OF THIS INITIATIVE."

"Each bill, except general appropriation bills and bills for the codification and general revision of the laws, shall contain only one subject, clearly expressed in its title. If any subject is embraced in any act and is not expressed in the title, only so much of the act not so expressed is void." Mont. Const. art. V, §11, cl. 3. The constitutional requirement that a law should contain only one subject has been strictly construed. State v. Joyland Club (1950), 124 Mont. 122, 143, 220 P.2d 988, 998. The purpose of requiring singleness of subject is to prevent the practice of embracing in the same bill incongruous matters which have no relation to each other or to the subject specified in the title, so that measures may not be adopted without attracting attention to them. Rosebud County v. Flinn (1940), 109 Mont. 537, 543-44, 98 P.2d 330, 334; Jobb v. Meagher County (1898), 20 Mont. 424, 437, 51 P. 1034, 1038. The "one subject" limitation has been applied to initiatives as well as laws passed by the Legislature. Martin v. State Highway Commission (1939), 107 Mont. 603, 88 P.2d 41. The test under this provision of the Montana Constitution is simply whether the title is of such character as to mislead the public as to the subjects embraced. City of Helena v. Omholt (1970), 155 Mont. 212, 220-21, 468 P.2d 764, 768.

We find that section 11(5)(d) of the Initiative is not embraced in the title of the Initiative. Contributions to support or oppose candidates, initiatives, referenda or

other ballot issues, which must be reported under section 11(5)(d), are not the payments made to "influence action of a public official" referred to in the title. The fact that the contributions covered by section 11(5)(d) are monies spent in an attempt to achieve political influence is an insufficient basis to create a relationship between the title and the section. The Initiative is an amendment and expansion of the Lobbying Act. It is clear from the title of the Initiative that the Lobbying Act was not being transformed into a general campaign finances act. We hold, therefore, that section 11(5)(d) is void.

## CONCLUSION

If an invalid part of a statute is severable from the rest, the portion which is constitutional may stand while that which is unconstitutional is stricken out and rejected. State v. Fire Department Relief Association, Etc. (1960) 138 Mont. 172, 178, 355 P.2d 670, 673. A statute "is not destroyed in toto because of an improper provision, unless such provision is necessary to the integrity of the statute or was the inducement to its enactment." Hill v. Rae (1916), 52 Mont. 378, 389-90, 158 P. 826, 831. If, when an unconstitutional portion of an act is eliminated, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained. Gullickson v. Mitchell (1942), 113 Mont. 359, 375, 126 P.2d 1106, 1114. The inclusion of a severability clause in the Initiative is an indication that its drafters and the voters desired this judicial policy to be applied to the Initiative. "If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more of its applications, the part remains in effect in all valid applications that

are severable from the invalid applications." Section 21, I-85.

While our application of constitutional doctrines has limited the Initiative in a number of areas, none of the provisions which we have voided are necessary to the integrity of the statute and they were not the inducement to its enactment. The Initiative, while being lengthy, is basically amendatory in nature. Its purpose was to expand Chapter 7, Title 5, of Montana's Lobbying Act, to provide for the disclosure of money spent to influence action of public officials and to require elected officials to disclose their business interests. This purpose is not frustrated by our limitation of the Initiative. Even after our excisions, Chapter 7, Title 5, as amended by the Initiative is complete in itself and capable of being executed in accordance with the intention of the people of Montana.

We reverse the judgment of the District Court and dissolve the injunction issued against the attorney general and the commissioner of political practices. We hold that those portions of the Initiative which we have declared void in this opinion[3] have no further effect. With the exception of those void portions, we hold that Initiative No. 85 shall remain in effect.

---

[3]See Appendix "C".

THE FOLLOWING ARE THE PORTIONS OF INITIATIVE NO. 85 WHICH ARE ESSENTIAL TO THIS DECISION. WE HAVE LINED OUT THOSE PARTS WHICH ARE VOID.

Section 1. §5-7-101, MCA is amended to read:

5-7-101. Purposes of chapter.

(1) The purposes of this chapter are to promote a high standard of ethics in the practice of lobbying, to prevent unfair and unethical lobbying practices, to provide for the licensing of lobbyists and the suspension of revocation of the licenses, to require elected officials to make public their business interests, and to require disclosure of the amounts of money spent for lobbying.

(2) Nothing in this chapter subjects any ~~Montana~~ citizen lobbying on his/her own behalf to any reporting requirements nor deprives any such citizen of the constitutional right to communicate with public officials.

Section 2. §5-7-102, MCA is amended to read:

5-7-102. Definitions. The following definitions apply in this chapter:

(1) "Individual" means a human being.

(2) "Person" means an individual, corporation, association, firm, partnership, state or local government or subdivision thereof, or other organization or group of persons.

(3) "Public official" means any individual, elected or appointed, acting in his official capacity for the state or local government or any political subdivision thereof, but does not include those acting in a judicial or quasi-judicial capacity.

(4) "Lobbying" includes:

(a) the practice of promoting or opposing the introduction or enactment of legislation before the legislature or the members thereof by any person other than a member of the

legislature or a public official acting in his official capacity; and

(b) the practice of promoting or opposing official action by any public official in the event the person engaged in such practice expends $1,000 per calendar year or more exclusive of personal travel and living expenses.

(5)(a) "Lobbyist" means any person who engages in the practice of lobbying for hire.

(b) "Lobbyist" does not include

(i) any individual Montana citizen acting solely on his/her own behalf, or

(ii) any individual working for the same principal as a licensed lobbyist, such individual having no personal contact with any public official on behalf of his/her principal.

(c) Nothing in this section deprives any citizen not lobbying for hire of the constitutional right to communicate with public officials.

(6) "Lobbying for hire" includes activities of any officers, agents, attorneys, or employees of any principal who are paid, reimbursed, or retained by such principal and whose duties include lobbying. When an individual is reimbursed only for his personal living and travel expenses, which together do not exceed $1,000 per calendar year, that individual shall not be considered to be lobbying for hire.

(7) "Unprofessional conduct" means:

(a) a violation of any of the provisions of this chapter;

(b) instigating action by any public official for the purpose of obtaining employment in opposition thereto;

(c) attempting to influence the action of any public official on any measure pending or to be proposed by

~~(i) the promise of support or opposition at any future election.~~

(ii) promise of financial support,

(iii) making public any unsubstantiated charges of improper conduct on the part of any other lobbyist, any principal, or any legislator,

~~(iv) any improper economic reprisal or other unlawful retaliation against any public official, or~~

~~(v) any means other than argument on the merits thereof,~~

~~(d) attempting to influence a decision or vote by a hearing examiner or quasi-judicial officer in any contested case proceeding under Part 6, Chapter 4, Title 2, MCA except as provided therein,~~

(e) attempting to knowingly deceive any public official with regard to the pertinent facts of an official matter or attempt to knowingly misrepresent pertinent facts of an official matter to any public official; or

~~(f) engaging in practices which reflect discredit on the practice of lobbying legislature.~~

(8) "Principal" means any person who makes payments in excess of $1,000 per calendar year for any of the following

(a) to engage a lobbyist, or

~~(b) in the case of a person other than an individual, to solicit, directly, indirectly or by an advertising campaign the lobbying effforts of another person.~~

(9) "Docket" means the register and reports of lobbyists and principals maintained by the commissioner pursuant to 5-7-201.

(10) "Payment" means distribution, transfer, loan, advance, deposit, gift, or other rendering made or to be made of money, property, or anything of value.

(11) "Payment to influence official action" means any of the following types of payment:

-27-

(a) direct or indirect payment to a lobbyist by a principal, as salary, fee, or compensation for expenses or for any other purpose;

(b) payment in support of or assistance to a lobbyist or lobbying activities, including, but not limited to, the direct payment of expenses incurred at the request or suggestion of the lobbyist.

(12) "Business" means any holding or interest whose fair market value is greater than $1,000, in any corporation, partnership, sole proprietorship, firm, enterprise, franchise, association, self-employed individual, holding company, joint stock company, receivership, trust or other entity or property held in anticipation of profit, but does not include non-profit organizations.

(13) "Commissioner" means the commissioner of campaign finances and practices, created by 13-37-102, renamed in [Section 19] the commissioner of political practices.

(14) "Elected official" means a public official holding a state office filled by a statewide vote of all the electors of Montana or a state district office, including, but not limited to legislators, public service commissioners and district court judges. The term "official-elect" shall also apply only to such offices.

Section 3. §5-7-103, MCA is amended to read:

5-7-103. Licenses--fees--eligibility.

(1) Any adult of good moral character who is a citizen of the United States and who is otherwise qualified under this chapter may be licensed as a lobbyist. The commissioner shall provide a license application form. The application form may be obtained in the office of the commissioner and filed therein. Upon approval of the application by the [Commissioner] and receipt of the license fee of $10 by the

-28-

commissioner, a license shall be issued which entitles the licensee to practice lobbying on behalf of one or more enumerated principals. Each license shall expire on December 31 of each even-numbered year or may be terminated at the request of the lobbyist.

(2) No application may be disapproved without affording the applicant a hearing. The hearing shall be held and the decision entered within 10 days of the date of the filing of the application.

(3) The fines and license fees collected under this chapter shall be deposited in the state treasury.

Section 4. §5-7-105, MCA is amended to read:

5-7-105. Suspension of lobbying privileges. No lobbyist whose license has been suspended and no person who has been adjudged guilty of a violation of any provision of this chapter may engage in lobbying for hire until that person has been reinstated to the practice and duly licensed.

Section 5. §5-7-201, MCA is amended to read:

5-7-201. Docket--contents. The commissioner shall make available to the public the information required by this chapter, including but not limited to the name and business address of each lobbyist, the name and business address of his/her principal, and the subject or subjects to which the employment relates or a statement that the employment relates to all matters in which the principal has an interest. The docket entry for each principal shall also indicate the principal's required reports of payments to influence official action by a public official.

Section 6. §5-7-202, MCA is amended to read:

5-7-202. Docket--public record. Such docket shall be a public record and open to the inspection of any individual upon demand at any time during the regular business hours of

the office of the commissioner.

Section 7.    §5-7-207, MCA is amended to read:

5-7-207.    Report to legislature.    Beginning with the first
Tuesday following the beginning of any regular or special
session of the legislature and on the first Tuesday of every
month thereafter during which the legislature is in session,
the commissioner shall from his/her records report to each
member of each house of the legislature the names of lobbyists
registered under this chapter, not previously reported, the
names of the principals whom they represent as lobbyists and
the subjects of legislation in which each principal is
interested.

Section 8.    §5-7-301, MCA is amended to read:

5-7-301.    Prohibition of practice without license and registra-
tion.

(1) No individual may practice as a lobbyist unless that
individual has been licensed under 5-7-103 and listed on the
docket as employed in respect to all the matters he/she is
promoting or opposing.

(2) No principal may directly or indirectly authorize or
permit any lobbyist employed by that principal to practice
lobbying until the lobbyist is duly licensed and the names
of the lobbyist and the principal are duly entered on the
docket.

Section 9.    §5-7-302, MCA is amended to read:

5-7-302.--Prohibited-compensation.---No-person-may-be-employed
as-a-lobbyist-for-a-compensation-dependent-in-any-manner-upon
the-passage-or-defeat-of-any-proposed-or-pending-official-action
by-a-public-official-or-upon-any-other-contingency-connected
with-such-action.

Section 10.    Ethical conduct.    No lobbyist or principal
shall engage in, or directly or indirectly authorize, any

unprofessional conduct.

Section 11. Principals to file accountings.

(1) A principal subject to this chapter shall file with the commissioner an accounting of payments made to influence the official action of a public official.

(2) If such payments are made solely to influence legislative action, such accounting shall be made:

(a) before February 16th of any year the legislature is in session and shall include all payments made in that calendar year prior to February 1st;

(b) before the 16th day of the calendar month following any calendar month in which the principal spent $5,000 or more and shall include all payments made during the prior calendar month; and

(c) within 60 days following adjournment of such session and shall include all payments made during such session, except as has previously been reported.

(3) If such payments are made to influence any other official action by a public offical or made to influence such other action and legislative action, such accounting shall be made:

(a) before February 16th of the calendar year following such payments and shall include all payments made during the prior calendar year; and

(b) before the 16th day of the calendar month following any calendar month in which the principal spent $5,000 or more and shall include all payments made during the prior calendar month.

(4) If no such payments are made during the reporting periods provided in subsections (2)(a), (2)(c), and (3)(a) above, the principal shall file a report stating such.

(5) Each accounting filed under this section shall:

(a) list all payments for lobbying in each of the following categories:

(i) original and derivative research (for which the cost may be estimated if necessary) done to support a lobbying argument or presentation;

(ii) publication and distribution of each publication, except that the cost of a newsletter or leaflet distributed to the membership of a principal need not be reported unless over one-half of that newsletter or leaflet is devoted to lobbying matters.

(iii) other printing;

(iv) news media;

(v) advertising, including production costs;

(vi) postage;

(vii) travel and personal living expenses;

(viii) salaries and fees, including allowances, rewards and contingency fees;

(ix) entertainment, including all foods and refreshments;

(x) telephone and telegraph; and

(xi) other office expenses;

(b) itemize, identifying the payee and the beneficiary,

(i) each separate payment conferring $10 or more benefit to any public official and

(ii) each separate payment conferring $100 or more benefit to more than one public official, regardless of individual benefit, except that in regard to a dinner or other function to which all senators or all representatives have been invited, the beneficiary may be listed as all members of that group without listing separately each person who attended;

(c) list each contribution and membership fee which amounts to $250 or more when aggregated over the period of one

calendar year paid to the principal, ~~regardless-of-whether~~ ~~it-was-paid-solely~~ for the purpose of lobbying, with the full address of each payer and the issue area, if any, for which such payment was earmarked;

~~(d)-list-each-political-contribution,-including-anything-of~~ ~~value,-paid-to-any-candidate-for-elective-public-office,-to~~ ~~any-committee-established-to-support-or-oppose-a-candidate-for~~ ~~elective-public-office,-or-to-any-committee-to-support-or~~ ~~oppose-any-initiative,-referendum,-or-other-ballot-issue,~~ ~~whether-such-payment-is-made-directly-or-indirectly-by-the~~ ~~principal-or-any-lobbyist-who-received-compensation-or-reim-~~ ~~bursement-for-such-payment-from-the-principal.~~

(e) list each official action which the principal or his agents exerted a major effect to support, oppose, or modify, together with a statement of the principal's position for or against such action; and

(f) be kept by the commissioner for a period of ten years. Section 12. Principals required to report--penalty for failure to report or for false statement. A principal may not make payments to influence official action by any public official unless that principal files the reports required under this chapter. A principal who fails to file a required report is subject to the penalty provided in 5-7-305 as well as any civil action provided for in this chapter. A principal who knowingly files a false, erroneous, or incomplete statement commits the offense of unsworn falsification to authorities.

Section 13. Reimbursement. Whenever a lobbyist invites a public official to attend a function which the lobbyist or his/her principal have fully or partially funded or sponsored, or whenever a lobbyist offers a public official a gift, the lobbyist must, upon request, supply the recipient public

official with the benefit's true or estimated cost and allow the public official to reimburse. Such expenditures must be itemized in the principal's reports with a notation "reimbursed by benefactee".

Section 14. Governmental Reporting. Budget preparation or response to requests of a house or committee of the legislature by any governmental entity shall not be considered lobbying payments for the purposes of this chapter.

Section 15. Audit of final accounting statements. The commissioner shall examine and may audit the accountings filed under [Section 11] and shall investigate any irregularities and report any apparent violations of this chapter to the attorneys having authority to prosecute. The lobbyist is required to provide and the principal is required to obtain and keep for a period of seven years from the date of filing all records supporting the accountings filed under [Section 11]. All such records shall be open to inspection on request of the commissioner or an attorney having authority to prosecute violations of this chapter. The commissioner and such attorneys are given the power to subpoena and compel attendance; issue enforceable civil investigative demands; take evidence; and require the production of any books, correspondence, memoranda, bank account statements, or other records which are relevant or material for the purpose of conducting any investigation pursuant to the provisions of this chapter.

Section 16. Disclosure by elected officials.

(1) Prior to December 15 of each even-numbered year, each elected official or official-elect shall file with the commissioner a business disclosure statement on a form provided by the commissioner. The statement shall provide

the following information: The name, address, and type of business of such individual and each member of such individual's immediate family. For this purpose "immediate family" includes the individual's spouse and minor children only.

(2) No such individual may assume or continue to exercise the powers and duties of the office to which that individual has been elected or appointed until such statement has been filed.

(3) The commissioner shall make such business disclosure statements available to any individual upon request.

Section 17.  Commissioner to make rules--statements of intent.

(1) The commissioner shall promulgate and publish rules necessary to carry out the provisions of [this act] in conformance with the Montana Administrative Procedure Act and, in particular, shall provide rules necessary to allocate salary, expenses, and any other payments between lobbying activities and other activities not connected with lobbying for any person whose activities are not solely limited to lobbying.

(2) Such rules shall be designed to effect and promote the purposes of this act, express or implied.  Such rules shall be as simple and easily complied with as possible.

Section 18.  Civil penalties and enforcement.

(1) Any person who violates any of the provisions of this chapter shall be subject to civil penalties of not less than $250 and not more than $7,500 according to the discretion of the district court, as court of original jurisdiction.  A lobbyist who violates any of the provisions of this chapter shall have his/her license suspended or revoked according to

the discretion of the court. Any public official holding elective office adjudged in violation of the provisions of this act is additionally subject to recall under Montana Recall Act, §2-16-601, MCA et seq, and such violation shall constitute an additional basis for recall to those mentioned in §2-16-603(3), MCA.

(2) The attorney general, commissioner, or the county attorney of the county in which the violation takes place may bring criminal or civil action in the name of the state for any appropriate criminal or civil remedy.

(3) If a prosecution is undertaken by the commissioner or any county attorney, all costs associated with the prosecution shall be paid by the state of Montana.

(4)(a) Any individual who has notified the commissioner, the attorney general and the appropriate county attorney in writing that there is reason to believe that some portion of this chapter is being violated may himself/herself bring in the name of the state an action (hereinafter referred to as a citizen's action) authorized under this chapter if:

(i) the attorney general and the appropriate county attorney have failed to commence an action hereunder within 40 days after such notice, and

(ii) said attorneys then fail to commence an action within 10 days after a written notice delivered to them advising them that a citizen's action will be brought if they do not bring an action.

(b) Each notification shall toll the statute of limitations applicable until the expiration of the waiting period.

(c) If the individual who brings the citizen's action prevails, he/she shall be entitled to be reimbursed by the state of Montana for costs and attorney's fees incurred: Provided that in the case of a citizen's action which is dismissed and which the court also finds was brought without

reasonable cause, the court may order the individual commencing the action to pay all costs of trial and reasonable attorney's fees incurred by the defendant.

(5) No civil action may be brought under this section more than seven years after the occurrence of the facts which give rise to the action.

(6) All civil penalties imposed pursuant to this section shall be deposited in the state general fund.

(7) A hearing under this chapter shall be held by the court unless the defendant-licensee demands a jury trial. The trial shall be held as soon as possible but at least 20 days after the filing of the charges and shall take precedence over all other matters pending before the court.

(8) If the court finds for the plaintiff, judgment shall be rendered revoking or suspending the license and the clerk of court shall file a certified copy of the judgment with the commissioner.

Section 19. Recodification. The office of the commissioner of campaign finances and practices, created by 13-37-102, shall be known as the office of the commissioner of political practices.

Section 20. Repealer. Sections 5-7-104, 5-7-205, 5-7-206, 5-7-303, and 5-7-304, MCA are repealed.

Section 21. Severability. If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

Section 22. Effective date. This act shall be effective upon passage and approval by the voters of the state of Montana.

## APPENDIX B

Penalty. Any person violating the provisions of this chapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by imprisonment in the county jail not more than 6 months or by a fine not exceeding $200, or both. (Section 5-7-305, MCA.)

## APPENDIX C

The word "Montana" is void in section 1(2) and in section 2(5)(b)(i). The following sections are void in their entirety: 2(7)(c)(i), 2(7)(c)(iv), 2(7)(c)(v), 2(7)(d), 2(7)(f), 2(8)(b), 9, 11(5)(a)(i), 11(5)(a)(ii), 11(5)(a)(iv), 11(5)(d). The words "regardless of whether it was paid solely" are void in section 11(5)(c).

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

-38-

Mr. Justice Daniel J. Shea concurring:

I concur with the opinion of the Court, even though I feel that we have strained considerably to uphold many of its provisions. But, as long as what we have done does not fly in the face of any constitutional provisions, I believe that we should give more leeway to initiatives passed by the electorate of this state.

In addition, I feel it necessary to comment on the findings and conclusions adopted by the trial court. The plaintiff proposed eleven findings of fact and the trial court adopted verbatim all eleven of them. The trial court, did, however, add finding twelve. The plaintiff proposed nine conclusions of law and the trial court adopted verbatim all nine of them. This is hardly an indication that the trial court carefully studied the constitutional issues involved and carefully entered into the decision-making process.

In Tomaskie v. Tomaskie (1981), ___ Mont. ___, 625 P.2d 536, 38 St.Rep. 416, this Court disapproved of the practice of adopting verbatim the proposed findings and conclusions of the prevailing party. In Jensen v. Jensen (Decided July 17, 1981, Cause No. 80-389), I set out in detail the reasons why no trial court should adopt verbatim the proposed findings and conclusions presented by the prevailing party. It is sad that in such an important case as this, that the trial court has chosen to rubber-stamp the proposed findings and conclusions submitted by the plaintiffs in this case. This is particularly so when the preliminary orders of the court, made final by the trial court's decision, declared all of Initiative 85 to be unconstitutional. Matters of such importance are certainly deserving of more attention than was obviously given here by the trial court.

Daniel J. Shea
Justice

-39-